06-0725
Bronx Household of Faith v. Bd. of Educ.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2006
(Argued: September 28, 2006        Decided: July 2, 2007)
Docket No. 06-0725-cv

------------------------------------------------------------x

THE BRONX HOUSEHOLD OF FAITH, ROBERT HALL, AND JACK ROBERTS,

        <u>Plaintiffs-Appellees</u>,

-- v. --

BOARD OF EDUCATION OF THE CITY OF NEW YORK and COMMUNITY SCHOOL DISTRICT NO. 10,

        <u>Defendants-Appellants</u>.

------------------------------------------------------------x

B e f o r e :  WALKER, LEVAL, and CALABRESI, <u>Circuit Judges</u>.

Appeal from denial of summary judgment in favor of, and entry of permanent injunction against, Defendants-Appellants.

VACATED and REMANDED.

DAVID A. CORTMAN, Alliance Defense Fund, Lawrenceville, GA (Jordan W. Lorence, Benjamin W. Bull, and Joseph P. Infranco, Alliance Defense Fund, Scottsdale, AZ, <u>on the brief</u>), <u>for</u> <u>Plaintiffs-Appellees</u>.

JANE L. GORDON, Senior Counsel, Corporation Counsel of the City of New York (Michael A. Cardozo, Corporation Counsel, Edward F.X. Hart, Lisa Grumet, and Janice Casey Silverberg, <u>on the brief</u>), New York NY, <u>for Defendants-Appellants</u>.

DAVID WHITE, Attorney, United States Department of Justice, Civil Rights Division, Appellate Section (Wan J. Kim, Assistant Attorney General, Dennis J. Dimsey and Eric W. Treene, Attorneys, Washington, D.C., Michael J. Garcia, United States Attorney for the Southern District of New York, David J. Kennedy and Andrew W. Schilling, Assistant United States Attorneys, New York, NY, on the brief), Washington, D.C., for Amicus Curiae United States of America.

MITCHELL A. KARLAN (Aric H. Wu, Marci R. Etter, and Farrah L. Pepper, Gibson, Dunn & Crutcher, LLP, Carol Nelkin, Jeffrey P. Sinensky, and Kara H. Stein, the American Jewish Committee, on the brief), Gibson, Dunn & Crutcher, LLP, New York, NY, for Amicus Curiae the American Jewish Committee.

ANTHONY J. COSTANTINI, the Committee on Education and the Law, Association of the Bar of the City of New York (Jonathan R. Bell, Rosemary Halligan, and Laura L. Himelstein, on the brief), New York, NY, for Amicus Curiae Committee on Education and the Law, Association of the Bar of the City of New York.

PER CURIAM:

The Bronx Household of Faith, a Christian church, has applied to use New York City school facilities for Sunday worship services.  In 2001, the Board of Education of the City of New York denied Bronx Household's application, relying on Standard Operating Procedure Manual (SOP) § 5.11, its rule then in effect

-2-

governing the use of school facilities by outside groups for "social, civic, [or] recreational meetings, . . . and other uses pertaining to the welfare of the community." New York Educ. L. § 414(1)(c). The District Court for the Southern District of New York (Loretta A. Preska, Judge) first preliminarily enjoined the City's enforcement of SOP § 5.11, concluding that the City could not exclude Bronx Household. This court affirmed the preliminary injunction. The district court then entered a permanent injunction barring the City from enforcing a revision of SOP § 5.11. ("Revised SOP § 5.11"). (Judges Walker and Calabresi believe the revision to be the current version of SOP § 5.11, while Judge Leval questions whether the revision has been formally adopted.)[1]

We hereby vacate the permanent injunction, although we reach that conclusion in rather circuitous fashion. Judge Calabresi would hold that this dispute is ripe for adjudication and would vacate the injunction because he concludes that Revised SOP § 5.11, while a restriction on the content of speech permitted on school property, is viewpoint-neutral. Judge Walker agrees that the dispute is ripe for adjudication but would affirm the injunction because he concludes that Revised SOP § 5.11 is viewpoint-discriminatory. Judge Leval expresses no opinion on the merits, but votes to vacate the injunction because he

---

[1] Judges Calabresi and Leval describe the remaining salient facts in their concurring opinions.

concludes that the dispute is not ripe for adjudication.

Our disparate views of this case leave us without a rationale to which a majority of the court agrees. While two judges who disagree on the merits believe the dispute is ripe for adjudication, the court cannot decide the merits of the case without the vote of the third judge, who disagrees as to ripeness. Judge Leval agrees that the dispute over Revised SOP § 5.11 would indisputably become ripe if the City were to deny Bronx Household permission to use school facilities in reliance on the terms of that rule.[2]

In vacating the judgment, we remand the action to the district court for all purposes. We have every reason to believe that both parties hope to bring this protracted litigation to an end by obtaining a decision on the merits. The City is free to adopt Revised SOP § 5.11 (if it has not already done so), and then require that Bronx Household apply to use school buildings pursuant to that rule. In the event Bronx Household does so, and the City denies the application, Bronx Household may seek review of that denial in the district court on an expedited basis. Either party's appeal from any judgment of the district court

---

[2] We express no firm opinion respecting whether or not the preliminary injunction, which preceded Revised SOP § 5.11 and remains in effect, bars the enforcement of Revised SOP § 5.11 (if it has been adopted), nor do we need to decide whether or not if it does, that fact in itself renders the dispute ripe. Rather, we note simply that we do not read the preliminary injunction to preclude the City from adopting Revised SOP § 5.11 (if it has not done so already).

-4-

will be referred to this panel.  If the parties desire a speedy resolution of their dispute, we believe all this can be accomplished with little delay; indeed, we direct the parties to advise us should they file another appeal and invite the parties, should they wish to, otherwise to apprise us of subsequent developments, in either case by directing a letter to the Clerk of Court.

The permanent injunction of the District Court for the Southern District of New York is VACATED.  Concurring opinions by Judges Calabresi and Leval, as well as a dissenting opinion by Judge Walker, follow.

CALABRESI, *Circuit Judge*:

Is worship merely the religious analogue of ceremonies, rituals, and instruction, or is worship a unique category of protected expression? I believe the answer to that question determines the result in this case brought under the Free Speech Clause of the First Amendment.

The Bronx Household of Faith ("Bronx Household"), a Christian church, along with its pastors Robert Hall and Jack Roberts, attacked as viewpoint discrimination the refusal of the Board of Education of the City of New York ("the Board") and Community School District No. 10 ("the School District") to permit the church to use school facilities for Sunday worship services. The district court (Preska, *J.*) granted summary judgment in favor of the plaintiffs and permanently enjoined defendants from enforcing their policy that excludes worship services from school facilities. I vote to vacate the court's determination that, as a matter of law, defendants' exclusion of worship services from school facilities is impermissible viewpoint discrimination, and remand the case to the district court for further developments in light of this and the other opinions of this panel filed today.

## I. Background

The relevant facts are not in dispute. The conflict between these parties began in 1994, when the School District denied

plaintiffs' request to rent space in the Anne Cross Mersereau Middle School ("M.S. 206B") for Sunday morning meetings. Bronx Household's weekly meetings would have included the "singing of Christian hymns and songs, prayer, fellowship with other church members and Biblical preaching and teaching, communion, sharing of testimonies" and a "fellowship meal" that allows attendees to talk and provide "mutual help and comfort to" one another. (First Affidavit of Robert Hall at 1).

Under New York State law, local school districts may permit their facilities to be used during after-school hours for a broad range of purposes, including "social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community; but such meetings, entertainment and uses shall be nonexclusive and shall be open to the general public." N.Y. Education Code § 414(1)(c) (McKinney 2006). The statute authorizes the "trustees or board of education of each district" to allow access to school facilities for any use it chooses within this range of purposes. § 414(1). District No. 10, a public school district in the Bronx, is subject to the jurisdiction of the New York City Board of Education.

In 1994, the School District enforced the Board's Standard Operating Procedures Manual (SOP) which, at the time, included a provision barring outside organizations from conducting "religious services or religious instruction on school premises after school,"

though it allowed groups to "discuss[] religious material or material which contains a religious viewpoint." SOP § 5.9. Plaintiffs brought an action against defendants to compel the School District to grant a permit for Bronx Household's weekly use of the school facilities, but the district court granted defendants' motion for summary judgment, and dismissed the suit. *Bronx Household of Faith v. Community Sch. Dist. No. 10*, No. 95 Civ. 5501, 1996 WL 700915 (S.D.N.Y. Dec. 5, 1996). We affirmed. 127 F.3d 207 (2d Cir. 1997), *cert. denied*, 523 U.S. 1074 (1998) [hereinafter *Bronx Household I*].

We subsequently applied our reasoning from *Bronx Household I* to another viewpoint discrimination challenge brought against the Milford School District by a private Christian organization for children (the Good News Club). We held that the Milford district could deny the Good News Club a permit to conduct religious instruction in school facilities because this amounted to "quintessentially religious" activity. *Good News Club v. Milford Central Sch.*, 202 F.3d 502 (2d Cir. 2000).

The Supreme Court, however, reversed our holding in that case. 533 U.S. 98 (2001). The Court found that the Good News Club was seeking "to address a subject otherwise permitted [in the school], the teaching of morals and character, from a religious standpoint." 533 U.S. at 109. The High Court did not dispute the validity of Justice Souter's description of the Club's activities as including

elements of worship, from the opening and closing of meetings with prayer, to activities such as "the challenge," where already "saved" children would ask God for strength, and "the invitation," during which the teacher would "invite" the "unsaved" children to "receive" Jesus as their "Savior from sin." *Id.* at 137-38 (Souter, J., dissenting). Nevertheless concluding that the Good News Club's activities were not "mere religious worship, divorced from any teaching of moral values," *id.* at 112 n.4, the Court declared: "We disagree that something that is 'quintessentially religious' or 'decidedly religious in nature' cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint," *id.* at 111. On this basis, and given that other types of moral and character development teaching were permitted "after school," the Court condemned Milford's exclusion of the Good News Club as viewpoint discrimination. *Id.* at 102, 108-109. It further held that while it is "not clear" whether a state interest in avoiding an Establishment Clause violation could justify viewpoint discrimination, "[w]e need not . . . confront the issue in this case, because we conclude the school has no valid Establishment Clause interest." *Id.* at 113.

After the Supreme Court's decision in *Good News Club*, Bronx Household in 2001 again applied for and was again denied a permit to use District No. 10's middle school for weekly Sunday meetings. The grounds of this denial remained the Board's SOP provision

prohibiting any "outside organization or group" from conducting "religious services or religious instruction on school premises after school." SOP § 5.11 (the section was previously numbered 5.09 in *Bronx Household I*). Bronx Household brought a new action against the defendants, and this time the district court, following the Supreme Court's ruling in *Good News Club*, preliminarily enjoined the School District from denying the permit on the basis of SOP § 5.11 and the religious nature of the church's weekly meetings. 226 F. Supp. 2d 401 (S.D.N.Y. 2002).[1] A divided panel of our court affirmed: "We find no principled basis upon which to distinguish the activities set out by the Supreme Court in *Good News Club* from the activities that the Bronx Household of Faith has proposed for its Sunday meetings at Middle School 206B." 331 F.3d 342, 354 (2d Cir. 2003) [hereinafter *Bronx Household II*].

In so doing, however, the majority stated that "it cannot be said that the meetings . . . constitute only religious worship, separate and apart from any teaching of moral values," and added:

> Like the Good News Club meetings, the Sunday morning meetings of the church combine preaching and teaching with such "quintessentially religious" elements as prayer, the singing of songs, and communion. The church's Sunday morning meetings

---

[1] The action was initially brought under the First Amendment, the Equal Protection Clause, and Sections 3, 8, and 11 of Article I of the New York Constitution. Since the district court granted the injunction requested by plaintiffs on the First Amendment free speech ground without addressing the remaining claims, 226 F. Supp. 2d 401, 426-27 (S.D.N.Y. 2002), plaintiffs have not pursued the alternative claims and they are not before us in the instant appeal.

also encompass secular elements, for instance a fellowship meal during which church members may talk about their problems and needs.

*Id.*

Notably, in *Bronx Household II*, we specified that "[o]ur ruling is confined to the district court's finding that the activities plaintiffs have proposed for their Sunday meetings *are not simply religious worship*, divorced from any teaching of moral values or other activities permitted in the forum." *Id.* (emphasis added). We thus left unresolved the instant appeal's central question:

How does the distinction drawn in our earlier precedent between worship and other forms of speech from a religious viewpoint relate to the dichotomy suggested in *Good News Club* between "mere" worship on the one hand and worship that is not divorced from the teaching of moral values on the other?

*Id.* at 355. Moreover, and despite our acknowledgment of an "obvious tension" between our ruling in *Bronx Household I* and the district court's application of *Good News Club*, we specifically "decline[d] to review the trial court's further determinations that, after *Good News Club*, religious worship cannot be treated as an inherently distinct type of activity, and that the distinction between worship and other types of religious speech cannot meaningfully be drawn by the courts." *Id.*

Bronx Household thereafter applied for, and was granted, permission to use P.S. 15 in Bronx, New York, on Sundays from 10:00am to 2:00pm. Bronx Household has used the school facilities

-11-

since August 2002, with attendance on a given Sunday morning reaching approximately 85-100 people. The church's Sunday meeting activities in the school facilities include "singing songs and hymns; teaching from the Bible; sharing testimonies from people in attendance; socializing; eating; engaging in prayer; and communion." 400 F. Supp. 2d 581, 592 (S.D.N.Y. 2005).

Subsequently, while the preliminary injunction was in effect and the church was exercising its permit to use school facilities, the Board of Education announced that it was modifying the enjoined SOP provision. As revised, § 5.11 states:

> No permit shall be granted for the purpose of *holding religious worship services, or otherwise using a school as a house of worship*. Permits may be granted to religious clubs for students that are sponsored by outside organizations and otherwise satisfy the requirements of this chapter on the same basis that they are granted to other clubs for students that are sponsored by outside organizations.

(emphasis added). Having altered § 5.11, defendants notified plaintiffs that:

> Plaintiffs' use of P.S. 15 for the Bronx Household of Faith's regular worship services is prohibited under the revised section 5.11. Defendants are not currently enforcing the revised section 5.11 . . . because of the preliminary injunction Order that was entered in this case. Should defendants prevail in this motion for summary judgment and the preliminary injunction Order be vacated, then any future application by plaintiffs to hold their worship services at P.S. 15 or any other school will be denied.

400 F. Supp. 2d at 588.

In March 2005, the parties cross-moved for summary judgment. Bronx Household moved to convert the July 2002 preliminary

injunction into a permanent injunction, contending the revised SOP § 5.11 is unconstitutional for the same reason the enjoined SOP provision was held to be unconstitutional. The district court granted plaintiffs' motion for summary judgment, denied defendants' cross-motion for summary judgment, and permanently enjoined the Board from enforcing SOP § 5.11 against appellees.

On appeal, defendants argue that: (1) their categorical exclusion of worship services as an after-hours use of school facilities does not constitute viewpoint discrimination; and (2) even if they are found to have discriminated on the basis of viewpoint, such discrimination was justified to avoid violations of the Establishment Clause. In response, plaintiffs acknowledge that "[f]rom the particular theological perspective of the pastors, . . . these activities done at the Sunday morning meeting [are] collectively a 'worship service.'" (Brief of Appellees at 10). But they contend that worship is protected like any other religious speech, and that under *Good News Club* the state discriminates on the basis of viewpoint when it excludes worship services from school facilities. Additionally, plaintiffs argue that the state does not possess a sufficiently overriding interest in avoiding an Establishment Clause violation to justify viewpoint discrimination against Bronx Household.

## II. Discussion

In *Bronx Household II* we expressly reserved judgment on whether worship is simply speech expressing a religious viewpoint on the same subject addressed in a variety of ways in the rituals, ceremonies, and instruction of secular and religious organizations, or whether worship is a unique subject protected as a *sui generis* category under the Free Speech Clause. *Cf. Bronx Household I*, 127 F.3d at 221 (Cabranes, J., concurring in part and dissenting in part) (stating that "there is no real secular analogue to religious 'services'"). At that time, we upheld a preliminary injunction against defendants' regulation barring the use of school facilities for "religious services or religious instruction," since the latter directly implicated the Supreme Court's ruling in *Good News Club*. But now the Board's modified regulation excludes only worship services that are not part and parcel of religious instruction. As a result, I believe that we must consider the relationship, after *Good News Club*, between worship, simpliciter, and other forms of protected speech, including religious and nonreligious instructional speech and rituals.[2]

---

[2] Judge Leval argues that the propriety of a permanent injunction against the *revised* SOP § 5.11 is not ripe for adjudication. The question is a close one. It turns, in part, on whether the Board has actually adopted the new SOP § 5.11, or whether the revision has simply been proposed. While there are some comments in the record that could be taken to mean the Board *will* adopt revised SOP

-14-

§ 5.11, there is also specific evidence in the record that defendants have already done so. *See, e.g.*, Statement of Attorney for the Board ("It is a policy that has been approved at the highest levels of the Department of Education. The only reason that we have not implemented it at this time or applied it to the plaintiffs in this case is because of the court's preliminary injunction."); Letter from Lisa Grumet to Jordan Lorence and Joseph Infranco (Aug. 17, 2005), 400 F. Supp. 2d 581, 588 (S.D.N.Y. 2005) ("The use of P.S. 15 for . . . regular worship services is prohibited under the revised section 5.11. . . . Should defendants prevail in this motion for summary judgment and the preliminary injunction Order be vacated, then any future application by plaintiffs to hold their worship services at P.S. 15 or any other school will be denied."). In deciding to make the injunction permanent and applying it directly to worship services, the court below must be taken to have found that the new SOP § 5.11 was, in fact, adopted, and I cannot say that this fact-finding was clearly erroneous.

Judge Leval relies, as he must, on the Supreme Court's leading decisions on ripeness, including *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977). That case permitted, at a constitutional level and at a prudential level, judicial consideration of an agency regulation prior to its enforcement, in part because the impact of the regulation on the plaintiffs was "sufficiently direct and immediate." *Id*. at 152. In this case, there is one unmistakable "direct and immediate" consequence for the parties; the case has been up and down the courts for years and no resolution as to the rights of the Board or Bronx Household is, as yet, forthcoming. At the prudential level, I do not believe we should ignore that very practical consequence.

Moreover, I am not convinced that there are not more traditionally legal consequences as well. If we simply vacate the permanent injunction without reaching the merits, as Judge Leval's opinion would do, we leave in place the preliminary injunction based on the old SOP § 5.11. That injunction correctly, in light of *Good News Club*, prohibited the Board from excluding Bronx Household's use of school premises for conduct that included "religious instruction," but it did more. It barred the Board from denying plaintiffs' application to rent space in the school "for morning meetings that include *religious worship* . . . ." (emphasis added). That, by itself, more than minimally hampers the Board in seeking to enforce the revised SOP § 5.11. I believe that this comfortably meets the constitutional ripeness requirements of *Abbott* and its progeny, and together with the effects of long delay in this case, weighs heavily on the issue of prudential ripeness.

I fully agree that we should take very seriously our

## Standard of Review

**A.**

We review *de novo* the district court's grant of summary judgment and construe the evidence in the light most favorable to the non-moving party. *See World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 165-166 (2d Cir. 2003); *Johnson v. Wing*, 178 F.3d 611, 614 (2d Cir. 1999). Summary judgment is appropriate only if there are no genuine issues of material fact such that the party making the motion is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Peck v. Public Service Mut. Ins. Co.*, 326 F.3d 330, 337 (2d Cir. 2003). This standard applies equally to cases, like the instant one, in which both parties moved for summary judgment. *See Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). As a result, when parties have filed cross-motions for summary judgment, the

---

obligation to avoid unnecessary constitutional adjudication. And if I agreed with Judge Leval that this case was not ripe, I would, like him, happily defer consideration. And I would even hope that it would not return or do so only in some constitutionally easier factual context. But once I, unlike Judge Leval, conclude that the case <u>is</u> ripe, I cannot hide from the constitutional issues that are there, fully argued, smack in our faces, and where failure to resolve them subjects the parties to long delay and costly uncertainties. That is, having found ripeness, I must decide the constitutional questions based on the facts before us today and not fail to act in the hope that they might disappear in another case involving other facts.

There are many arguments in favor of the position Judge Leval takes, especially with respect to prudence. I do not wish to undervalue them. All in all, though, I think the correct and prudent thing to do in this case is to bite the bullet and decide what the constitutional consequence of the exclusion of worship services, as against religious instruction, is.

court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

**Applicable Level of Constitutional Scrutiny**

**B.**

The Constitution does not guarantee unlimited freedom to speak on government property. *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 799 (1985). The scrutiny applied to restrictions of speech on government property varies with the nature of the forum in which the speech occurs. To guide us, in this respect, the Supreme Court has defined four categories of "fora for expression . . . that, correspondingly, fall along a spectrum of constitutional protection." *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625 (2d Cir. 2005).

In traditional public fora – streets, parks, and places that "by long tradition . . . have been devoted to assembly and debate," *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983) – speakers can be excluded only if the exclusion is "necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800.

We apply the same scrutiny to restrictions in a second category, the "designated public forum." "[W]hen the government has intentionally designated a place or means of communication as a public forum[,] speakers cannot be excluded without a compelling governmental interest," *id.*, and this remains so even though the forum is not traditionally open to public assembly and debate.

The Court has also recognized a third category, the limited public forum. A limited public forum is created when the government designates "a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Id.* at 802. In the limited public forum, an entire class of speakers or subjects may be excluded according to "reasonable, viewpoint-neutral rules governing the *content* of speech allowed." *Peck*, 426 F.3d at 626. But, once the government "allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991); *see also Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("[T]he State must respect the lawful boundaries it has itself set. The state may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint.") (internal quotation marks and citations omitted).

Finally, in a nonpublic forum, which has not been opened by tradition or designation to the public for communication, speech may be excluded through any "reasonable" content-based restrictions so long as these do not "suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46.

In *Bronx Household I*, we held that defendants' school facilities constituted a limited public forum and, consequently, that speech could be barred only through restrictions that were viewpoint neutral and reasonably related to the limited purposes of the forum. 127 F.3d at 211-214. *Bronx Household II* did not revisit this finding.[3] We remain bound by our finding that the school in the case at bar is a limited public forum. There is nothing in the record that requires us to reconsider that holding. And *Good News Club* in no way calls our reasoning on this point into question. 533 U.S. at 107; *id.* at 136 n.1 (Souter, J., dissenting).[4]

---

[3] Even prior to Bronx Household's suits, we had repeatedly found that New York State, in its statute authorizing the use of school facilities, intended to create only a limited public forum. *Deeper Life Christian Fellowship v. Sobol*, 948 F.2d 79, 83-84 (2d Cir. 2001) (citing *Tretley v. Bd. of Ed.*, 65 A.D.2d 1 (N.Y. App. Div. 1978)); *see also Cornelius*, 473 U.S. at 802; *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 390 (1993) ("There is no question that the [School] District, like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated.").

[4] It bears observing that, in constituting this particular limited public forum, defendants excluded in their entirety several other classes of speakers and subjects apart from those at issue in the

Since the forum involved in this case is a limited public forum, the question of whether defendants' exclusion of worship services constitutes content or viewpoint discrimination becomes crucial. For, as the Supreme Court has stated in *Rosenberger*:

> [I]n determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, *content discrimination*, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, *viewpoint discrimination*, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

515 U.S. at 829-30 (emphasis added).

It is, of course, not always easy to "draw[] a precise line of demarcation" between "what amounts to a subject matter unto itself, and what, by contrast, is best characterized as a *standpoint* from which a subject matter is approached." *Peck*, 426 F.3d at 630 (citing *Rosenberger*, 515 U.S. at 831). Nevertheless, the distinction is essential to the Court's balance between a required protection of speech and an essential protection of the government's ability to define the bounds of a limited forum it chooses to open. And, as the Court has written unequivocally, the State may be justified "in reserving [its forum] for certain groups

instant case. Among those excluded were electoral candidates' "political events, activities or meetings," SOP § 5.7, and any "commercial purposes, except for flea market operations." SOP § 5.10. As a result, any redefinition of the nature of the school forum before us would necessarily trigger searching scrutiny of the Board's exclusion from school facilities of political and commercial activities as well as the worship services involved in the current appeal.

or for the discussion of certain topics." *Rosenberger*, 515 U.S. at 829. It follows that we may uphold defendants' exclusion of worship services from their limited public forum, but that we may only do so if we find that SOP § 5.11 is a "reasonable, *viewpoint-neutral* rule[] governing the *content* of speech allowed." *Peck*, 426 F.3d at 626 (first emphasis added) (citing *Hotel Employees & Rest. Employees Union Local 100*, 311 F.3d at 545-6); *see also New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 128 (2d Cir. 1998).

### C.      Viewpoint Neutrality

In the end, I conclude that the barring of worship services from defendants' school facilities is a content-based restriction and does not constitute viewpoint discrimination. In reaching this conclusion, I first examine how the Court has defined viewpoint discrimination, and then analyze the restriction before us.

### 1. Defining Discrimination on the Basis of Viewpoint

In a limited public forum, speech addressing an otherwise permitted subject may not be restricted on the basis of its viewpoint, and this concept applies directly to protect *religious* approaches to the subject that is being discussed. This core principle of the Supreme Court's religious discrimination jurisprudence derives from three key decisions: *Lamb's Chapel v.*

-21-

*Center Moriches Union Free School District*, 508 U.S. 384 (1993), *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995), and *Good News Club v. Milford Central School*, 533 U.S. 98 (2001).

In *Lamb's Chapel*, a unanimous Supreme Court declared unconstitutional the denial of an evangelical church's request to use school facilities to show a film series addressing child-rearing questions from a Christian perspective. The Court concluded that "it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and childrearing except those dealing with the subject matter from a religious standpoint." 508 U.S. at 393. The Court emphasized that *Lamb's Chapel* concerned not just any religious speech, but specifically a religious perspective on the clearly permitted subject of childrearing and family:

> There is no suggestion . . . that a lecture or film about
> child rearing and family values would not be a use for social
> or civic purposes otherwise permitted . . . . That subject
> matter is not one that the District has placed off limits to
> any and all speakers.

*Id.*

In *Rosenberger*, the Court found that the University of Virginia discriminated on the basis of viewpoint by denying funding for a student group that published a newspaper with a Christian editorial viewpoint:

By the very terms of the [University fund's] prohibition, the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints. Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.

515 U.S. at 831. Once again, the Court found it essential that "[t]he prohibited perspective, not the general subject matter, resulted in the [University's] refusal to make . . . payments." *Id*.

Finally, in *Good News Club* the Court affirmed the principle that "speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." 533 U.S. at 112. The Good News Club had applied to use the Milford District's school facilities for meetings that included "singing songs, hearing a Bible lesson and memorizing scripture," 533 U.S. at 103, with "the purported purpose . . . to instruct children in moral values from a Christian perspective." 202 F.3d 502, 504 (2d Cir. 2000). The Club characterized itself as a youth organization that aids children's moral and spiritual development through the use of Bible stories to teach such "values as obedience or resisting jealousy." *Id*. at 509. The Club described these and its other activities as follows:

The Club opens its session with Ms. Fournier taking attendance. As she calls a child's name, if the child recites a Bible verse the child receives a treat. After attendance, the Club sings songs. Next[,] Club members engage in games that involve, *inter alia,* learning Bible verses. Ms. Fournier

-23-

then relates a Bible story and explains how it applies to Club members' lives. The Club closes with prayer. Finally, Ms. Fournier distributes treats and the Bible verses for memorization.

*Id.* at 507. The Club's materials included a prayer booklet called the "Daily Bread," which "contained stories that refer to the second coming of Christ, accepting the Lord Jesus as the Savior from sin, and believing in the Resurrection and in the descent of the Lord Jesus from Heaven." *Id.* On this basis, the school district concluded that the Club's activities were not discussing "secular subjects such as child rearing, development of character and development of morals from a religious perspective, but were in fact the equivalent of religious instruction itself." *Id.*

The Supreme Court overturned this court's finding that Milford's exclusion of the Club was viewpoint neutral. Likening the Club's Bible study instruction to the Lamb's Chapel film series, the Court held:

> The only apparent difference between the activity of Lamb's Chapel and the activities of the Good News Club is that the Club chooses to teach moral lessons from a Christian perspective through live storytelling and prayer, whereas Lamb's Chapel taught lessons through films. This distinction is inconsequential. Both modes of speech use a religious viewpoint.

533 U.S. at 109-10. Significantly, the Court held that even if the Club's activities were "quintessentially religious" or "decidedly religious in nature," they could still be characterized properly as the teaching of morals and character development: "What matters

for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations *to provide a foundation for their lessons*." *Id.* at 111 (emphasis added).

## 2. <u>The Category of Worship Services</u>

What, then, is worship? Is it an approach to or a way of considering an otherwise permitted subject of discussion, or is it a unique subject? Defendants argue that, while a film series on childrearing, a student newspaper, and instruction on moral development "no doubt dealt with . . . subject[s] otherwise permissible," *Lamb's Chapel*, 508 U.S. at 394, worship is not simply another standpoint on a secular subject. Worship is the *sui generis* subject "that the District has placed off limits to any and all speakers," regardless of their perspective. *Id.* at 393.[5] I agree.

---

[5] Much of my discussion is consistent with and derives from the very powerful opinion of Judge Cabranes, concurring in part and dissenting in part in *Bronx Household I*, 127 F.3d at 221 ("Unlike religious 'instruction,' there is no real secular analogue to religious 'services,' such that a ban on religious services might pose a substantial threat of viewpoint discrimination between religion and secularism."). The Ninth Circuit has reached the same conclusion in an analogous case, *Faith Ctr. Church Evangelistic Ministries v. Glover*, 462 F.3d 1194, 1211 (9th Cir. 2006) ("Religious worship . . . is not a viewpoint but a category of discussion within which many different religious perspectives abound.").

Indeed, the *Good News Club* Court itself recognized this subject matter, worship, as falling outside the boundary of its viewpoint discrimination jurisprudence. In finding that the Club's religious instruction was just one viewpoint among many on moral character and development, the Court emphasized the distinction between this instructional "viewpoint" and the separate category of "mere religious worship, divorced from any teaching of moral values." 533 U.S. at 112 n.4. And the Court's majority specified that the Second Circuit had not characterized the Club's activities as "religious worship." *Id.* It was for this reason that – while acknowledging that the Club's activities would include prayer and be of a "quintessentially religious" nature – the Court found no basis for considering the group's "use of religion as something other than a viewpoint merely because of any evangelical message it conveys." *Id.* By contrast, the record in the case before us makes clear that Bronx Household's use of religion was expressly for worship *in itself*, and not as a form of discussion of or approach to other topics.[6]

---

[6] Justice Souter, in dissent, argued that the Good News Club's activities constituted "an evangelical service of worship." 533 U.S. at 138. Plaintiffs suggest that, because the Court acknowledged Justice Souter's conclusion and determined that "[r]egardless of the label . . . what matters is the substance of the Club's activities," *id.* at 112 n.4, the High Court must have deemed "worship services" to be a viewpoint on an otherwise permitted subject. This argument fails, however, because the majority did no more than validate Justice Souter's recitation of the Club's activities, not his label of them as a worship service. Indeed, the Court expressly stated that these activities did not

In applying for a permit to use school facilities, Bronx Household's pastor described the proposed activities with three words: "Christian worship service." (EBT Transcript of Robert Hall (Jan. 24, 2005)). Despite subsequent changes in plaintiffs' account of these activities, Pastor Hall repeatedly confirmed that "Christian worship service" is an "accurate description" of that for which Bronx Household requested permission to use school facilities. *Id.*[7] Specifically, Bronx Household called its meetings a "church service" and enumerated the activities engaged in as including the "singing of Christian hymn and songs, prayer, fellowship with other church members, Biblical preaching and teaching, communion, sharing of testimonies and social fellowship among the church members." (First Affidavit of Robert Hall). Plaintiff described these many "component activities that go to make up a worship service," as follows:

> In our church service, we seek to give honor and praise to our Lord and Savior Jesus Christ *in everything that we do. To*

---

"constitute mere religious worship, divorced from any teaching of moral values." *Id.*

[7] Defendants note that in subsequent permit applications, plaintiffs listed only the component activities of the Sunday meetings and did so in order to avoid the term "worship." Pastor Hall stated: "As a tactical move, we decided beforehand to avoid using the dreaded 'W' word for (shudder) worship. From their point of view, the school rents it building to groups involved in community, civic, and social activity. But worship, according to them, is a uniquely religious activity for which there is no 'secular analog.'" Given Pastor Hall's clear record statement of what the facilities were to be used for, I need not, and do not, consider whether defendants' description of plaintiffs' later permit applications as mere "litigation strategy" is correct.

*that end* we sing songs and hymns of praise to our Lord. We read the Bible and the pastors teach from it because it tells us about God, what He wants us to do and how we should live our lives. We celebrate the Lord's Supper (communion) each Sunday . . . .

(emphasis added). And Hall expressly characterized his Sunday morning meetings as worship services because "[w]e ascribe worth, our supreme worth, to Jesus Christ."

On appeal to us, however, plaintiffs and their amici argue that the activities in worship services amount only to the expression of a viewpoint on the discussions of social, civic, and community welfare subjects as to which "thousands of permits have been granted [by defendants] to diverse groups, including sports leagues, Legionnaire Greys, Boy and Girl Scouts, community associations, and a college for holding English instruction." In doing this, plaintiffs challenge, in three ways, the characterization of worship as a unique subject. First, they claim that the activities composing their worship services are the same as those involved in the religious instruction protected as a *viewpoint* in *Good News Club*. Second, plaintiffs argue the church's worship services "parallel" the ceremonies and rituals conducted by other groups who are granted access to defendants' schools. In this respect, they claim their "worship" services stand in the same relationship to these permitted rituals as the moral development lessons taught by the Boy Scouts stood, according to the *Good News Club* Court, to the lessons in moral development taught from a

-28-

religious perspective by the Good News Club. Third, plaintiffs contend, based on Supreme Court precedent, that there can be no intelligible content to the distinction between worship and other religious speech. I believe all three arguments are unavailing.

**(i)**

In *Good News Club* the Court held that the religious instruction under consideration expressed a protected viewpoint on the permitted subjects of instruction, i.e., character and moral development, and only on these. The Court specifically concluded that Milford had interpreted "its policy to permit discussions of subjects such as child rearing, and of the 'development of character and morals.'" 533 U.S. at 108; *see also id.* (holding that, according its "Community Use Policy" establishing the limited forum, "there is no question that teaching morals and character development to children is a permissible purpose under Milford's policy"). And the Court's reasoning confirmed that the boundary of its ruling must be defined by the otherwise permitted subject matter at stake. *See, e.g.*, 533 U.S. at 111 ("*[W]hen the subject matter is morals and character*, it is quixotic to attempt a distinction between religious viewpoints and religious subject matters.") (quoting 202 F.3d at 512 (Jacobs, J., dissenting) (emphasis added)). In the case at bar, by contrast, the *subject*, "worship," is not a viewpoint on a "subject matter[,] morals and

character," *id.*; the subject is not a lecture or film about childrearing or family values; and the subject is not a variety of topics for journalistic exploration that the defendants permitted, except when they are undertaken from a religious perspective.

Were we to follow plaintiffs' construction of *Good News Club* and consider worship to be just a religious viewpoint on the subject of the welfare of the community, we would, whenever speech implicates religion, eviscerate the Supreme Court's distinction between *viewpoint* and the subject matter to which that viewpoint or approach is applied. That is not the meaning of *Good News Club*, and such a meaning severely misunderstands the nature of worship.

To be sure, some of the same activities that were part of the religious instruction validated in *Good News Club* are included in the worship services that Bronx Household seeks to conduct. The record confirms that the church's proposed activities included the singing of Christian hymns and songs along with Biblical preaching and teaching. But the *Good News Club* Court sanctioned such activities, of a "quintessentially religious nature," only because they could "also be characterized properly as" the viewpoint from which students were instructed in moral and character development. 533 U.S. at 111. The worship services before us today cannot be properly so characterized. For, as Pastor Hall acknowledged, even though the church may "do the same things that a Bible study group does," significant differences separate the subject of worship

services from moral instruction given from a religious viewpoint: "The Bible study club would not administer the sacraments of baptism and the Lord's supper. That would be a big difference."

**(ii)**

Worship services, moreover, are not in any sense simply the religious analogue of ceremonies and rituals conducted by other associations that are allowed to use school facilities. Indeed, holding that *worship* is only an agglomeration of rites would be a judicial finding on the nature of worship that would not only be grievously wrong, but also deeply insulting to persons of faith. As one such person, I find the notion that worship is the same as rituals and instruction to be completely at odds with my fundamental beliefs. Prayer and worship services are not religious viewpoints on the subjects addressed in Boy Scouts rituals or in Elks Club ceremonies. Worship is adoration, not ritual; and any other characterization of it is both profoundly demeaning and false.

Not surprisingly, therefore, Pastor Hall's own testimony belies plaintiffs' claim that they seek to conduct only the same viewpoint-expressive activities as those of other groups discussing permitted subjects. Hall wrote and distributed an article to church members pointedly distinguishing the church from such other clubs or associations. Unlike an "Ecclesiastical club" or a "political club," Pastor Hall explained, "the church [i]s a covenant

-31-

community"; the church is "not a group of people who have a common interest in the same way that stamp collecting and coin collecting bring people together." And Hall explicitly contrasted his group's meetings with those of the Boy Scouts whose rituals – flag ceremonies, the Pledge of Allegiance, and the Scout Oath – "might be a parallel, but [are] different": "We engage in the teaching and preaching of the word of God. We administer the sacraments of baptism and the Lord's supper. Those would be the differences. We sing hymns. We sing Christian songs. We pray."

One cannot read what Pastor Hall is saying – or for that matter virtually any religious description of worship – sympathetically, without concluding that to *worship* is not only more than engaging in rituals, but that it is categorically different. In other words, it would be absurd to characterize the Scouts as worshipping the teachings of Lord Baden-Powell, the founder of the Scouts movement, simply because Scout ceremonies and rituals ascribe worth to his message. What the Scouts are doing and what worshippers do, are categorically different!

**(iii)**

Plaintiffs base their final argument – that there is no difference between worship and other forms of religious speech – on the Supreme Court's ruling in *Widmar v. Vincent*, 454 U.S. 263 (1981). *Widmar* held that worship, like all other religious

-32-

expression, is protected under the Free Speech Clause of the First Amendment. Of course it is. The *Widmar* majority rejected the claim of the Justices in "dissent . . . that 'religious worship' is not speech generally protected by the 'free speech' guarantee," 454 U.S. at 269 n.6, and rightly so. But that is not the issue before us.

The *Widmar* Court was concerned solely with whether worship was religious speech, and held that it was. The Court did not consider whether worship was speech of a unique sort, a subject of address that transcended and was different in kind from the subjects whose discussion from a religious viewpoint the Court protected in *Good News Club*, *Rosenberger,* and *Lamb's Chapel*. As a result, the *Widmar* Court certainly did not conclude that the exclusion of worship constituted viewpoint discrimination. It understandably held that a university's exclusion of "religious worship and religious discussion" from school facilities was impermissible *content* discrimination in that public forum. 454 U.S. at 265, 269-70. Consequently, plaintiffs' invocation of *Widmar* to show that worship cannot be a separate subject of speech is unavailing.

### 3. **Must Worship be Religious?**

The bulk of this opinion has been written on the premise that worship is always a religious matter. But I am not sure there cannot be *secular* as well as *religious* worship. When people speak

-33-

of "worshipping" mammon, sex, or art, are they simply speaking metaphorically, or are they expressing a relationship of adoration that is the secular equivalent of religious worship and is of a different order from participating in ritual or ceremony? While the answer to that question seems to me to be anything but clear, in the end a resolution does not matter for this decision.

If we treat worship as being solely religious, then the first provision in the Board's regulation – barring use of the school for "religious worship services" – is a trivial redundancy that does not affect worship's status as *sui generis*. If, instead, we treat worship as something that can also be secular, then the Board's exclusion of religious (as against secular) worship is clearly invalid. *See Good News Club*, 533 U.S. 98. But the second part of the Board's regulation, which bars use of the school "as a house of worship," nevertheless remains in force. For it excludes religious and secular worship alike. Assuming arguendo, therefore, that secular worship exists, that provision does not distinguish between religious and secular approaches, but instead bars the whole category. Accordingly, it constitutes content rather than viewpoint discrimination.

The record is undisputed that plaintiffs wish to use the school facilities as a house of worship. It follows that, if content discrimination is permitted, then Bronx Household can be excluded.

**Reasonableness of Content Discrimination**

D.

Content discrimination, even in a limited public forum, must be reasonable in light of the purposes of the forum to be constitutionally permitted. *Perry Educ. Ass'n*, 460 U.S. at 49. Given our prior holdings, the Board's exclusion of worship services from school facilities meets this requirement.

In *Bronx Household I*, this court stated:

> We think that it is reasonable in this case for a state and a school district to adopt legislation and regulations denying a church permission to use school premises for regular religious worship. We think that it is reasonable for state legislators and school authorities to avoid the identification of a middle school with a particular church. We think that it is reasonable for these authorities to consider the effect upon the minds of middle school children of designating their school as a church. And we think that it is a proper state function to decide the extent to which church and school should be separated in the context of the use of school premises for regular church services. Education, after all, is a particularly important state function, and the use of school premises is properly a matter of particular state concern. Finally, it is certainly not unreasonable to assume that church services can be undertaken in some place of public assembly other than a public middle school in New York City.

127 F.3d at 214. We construed the purposes of the "school" limited public forum in the same way in *Deeper Life Christian Fellowship v. Board of Education of the City of New York*, 852 F.2d 676, 680 (2d Cir. 1988); *see also Deeper Life Christian Fellowship v. Sobol* [*Deeper Life II*], 948 F.2d 79, 83 (2d Cir. 1991) ("We follow our prior opinion in *Deeper Life I* in holding that under § 414, 'access to the school property is permitted only where it serves the

interests of the public in general, rather than that of sectarian groups . . . .'").

Similarly, we rejected the claim of the Good News Club that its exclusion – even if it constituted only content discrimination – would be unreasonable because "there is little risk that children would confuse the Club's use of school facilities with the school's endorsement of the religious teachings." We wrote:

> This argument is foreclosed by precedent. In *Bronx Household of Faith,* we stated that "it is a proper state function to decide the extent to which church and school should be separated in the context of the use of school premises." Furthermore, "it is reasonable for state legislators and school authorities to avoid the identification of a . . . school with a particular church."

202 F.3d at 509 (quoting *Bronx Household I*, 127 F.3d at 214) (internal citation omitted).

Although the Supreme Court reversed our holding that Milford's restriction was viewpoint neutral, the Court did not address our conclusion that were the restriction only content-based, it would be reasonable in light of the purposes of the limited school forum. Accordingly, we remain bound by our finding in *Bronx Household I* that the content-based restriction in SOP § 5.11 is reasonable.[8]

---

[8] Moreover, the record discloses several grounds on which defendants' exclusion of worship services, if only content-based, can reasonably rest. First, defendants pointed to the concern that "[b]ecause most activities that occur in schools during nonschool hours are, in fact, sponsored by the school, . . . children are unlikely to understand that weekly worship services are not sponsored or supported by the school." (Brief of Petitioners at 18); *see also* Declaration of Carmen Farina (testifying to children's confusion about the church's relationship with the

-36-

school district after the preliminary injunction compelled access); Declaration of Thomas Goodkind (same); Declaration of Veronica Najjar (same). Deputy Chancellor Fiorina testified that "[a] congregation's presence in a school may be particularly confusing for children":

I know from my training and experience that children – especially elementary school or middle school children – . . . are unlikely to understand that a church that uses their school for its religious worship services is not sponsored or supported by the school. . . . Young children . . . could easily and understandably conclude that the religious institution is supported by the school.

Second, defendants asserted that members of the *community* who are not church members would feel "marginalized, confused, and shut out by the long-term presence of weekly congregational worship services in their local public school." In this respect, the record reflects many complaints sent to the Board by parents and other community members expressing concerns that public school buildings in their neighborhoods were becoming identified with the church and its religious worship services. We need not resolve here how these complaints would inform an examination of a putative challenge, under the Establishment Clause, to the use of the school as a house of worship. I take note of this concern only as it constitutes an additional reasonable basis for defendants' *content*-based restriction of worship services given the purposes of this limited forum.

Finally, it was reasonable for the Board to determine not to open the use of its limited forum to a class of speech which, in practice, could only be engaged by some but not all religions. Defendants point out that "certain denominations and congregations are shut out of the forum because their day of worship is not Sunday." (Reply Brief of Petitioners at 20). Schools are schools, and are in session during all weekdays. Traditionally, and without any view towards discriminating between one religion and another, many school activities also take place on Saturdays. We need not here concern ourselves with the historical reasons why the school week is such as it is and the possible link to Christianity of that schedule. That long has been settled. *See, e.g.*, *Gallagher v. Crown Kosher Super Market of Mass.*, 366 U.S. 617 (1961); *Two Guys from Harrison-Allentown, Inc. v. McGinley*, 366 U.S. 582 (1961). As a result, school facilities are only limitedly available during the week or even on Saturday. That means that if the facilities are to be used for worship, which in almost all religions takes place most intensely on a particular day of the week, permission to use school facilities for worship must, as a practical matter, favor Christian over other – especially Jewish and Muslim – religious

## III. Conclusion

I would hold that defendants' exclusion of worship services is viewpoint neutral. Further, seen only as a content-based restriction, I would find that the exclusion is reasonable in light of the purposes of the limited public forum involved. Given the positions taken by the other members of this panel, however, my disposition is limited to holding that the district court's permanent injunction and grant of summary judgment are VACATED, and the case is REMANDED for further developments.

---

organizations. We need not decide here whether this lack of neutrality among religions would implicate a potential violation of the Establishment Clause that would be sufficiently overriding as to permit discrimination on the basis of viewpoint. For the question now before us is not *viewpoint* discrimination, but simply the existence of a reasonable justification for *content*-based rules. And defendants' desire to avoid seeming to favor some religions is a reasonable ground for limiting this forum only to speech that does not include the category "worship."

LEVAL, *Circuit Judge*:

This appeal is brought by the defendants, the Board of Education of the City of New York ("the Board") and Community School District No. 10 ("the School District") (collectively, "the City" or "the City defendants"), from a permanent injunction entered by the District Court for the Southern District of New York (Preska, *J.*). The injunction bars the City from enforcing a newly proposed Standard Operating Procedure § 5.11 ("Proposed SOP § 5.11") so as to exclude the plaintiff, Bronx Household of Faith ("Bronx Household"), from using a City-owned school building for Sunday church services. Proposed SOP § 5.11 would prohibit the use of New York City public schools for "religious worship services" or as a "house of worship." The district court, relying on the Supreme Court's ruling in *Good News Club v. Milford Central School*, 533 U.S. 98 (2001), found that the City's enforcement of Proposed SOP § 5.11 to deny Bronx Household permission to use school facilities for its services would violate the First Amendment.

In ruling on the City defendants' appeal from the judgment, our court divides three ways. Judge Walker would affirm, finding that the district court was correct in enjoining enforcement of Proposed SOP § 5.11. Judge Calabresi would vacate the judgment, finding it to be in error. I would also vacate the judgment but for a different reason, expressing no opinion whether the judgment was based on a correct or incorrect perception of the substantive

standards of the First Amendment. In my view, the judgment should be vacated because there was no ripe dispute between the parties involving the constitutionality of Proposed SOP § 5.11 which the court could appropriately adjudicate.

At the time of the district court's judgment, Bronx Household was suffering no harm by reason of the City's proposed adoption of the new SOP. The proposed rule had never been invoked by the City as a basis for denying Bronx Household access to school facilities. Indeed it had not even been adopted, but was only a proposed rule that had been provisionally approved by City officials. Rather, a former version of SOP § 5.11 ("Old SOP § 5.11") had been invoked to exclude Bronx Household from using school facilities. Litigation over the exclusion under Old SOP § 5.11 had resulted in a preliminary injunction prohibiting enforcement of that provision to exclude Bronx Household. Subsequently, in asking the district court to make its final adjudication on the basis of the new proposed SOP, rather than with regard to the SOP which had been invoked in denying Bronx Household's application, the City asserted that, *if the preliminary injunction against it were lifted and it were granted summary judgment* (effectively allowing the City to exclude Bronx Household under the old standard), the City *would then invoke* Proposed SOP § 5.11 to deny Bronx Household's *future applications*. Given the contingent nature of the City's stated intentions, Proposed SOP § 5.11 may never be enforced against Bronx

Household.  Indeed, it may never be adopted.

There was no present controversy between the parties involving application of the new standard.  The question whether the City might constitutionally exclude Bronx Household in reliance on Proposed SOP § 5.11 was speculative and hypothetical.  In fact, notwithstanding the City's prediction of how it would rule on an application which had never been made, there is sufficient difference between the new standard and the old rule upon which the City previously denied Bronx Household's application as to leave substantial uncertainty as to how such an application might play out.

Especially in view of the undesirablity of rushing into unnecessary constitutional adjudications, the sensitive constitutional question of whether Proposed SOP § 5.11 violates the First Amendment would be better adjudicated by a court after the rule has been adopted and an administrative proceeding has explicitly confronted and ruled on its applicability to the activities of Bronx Household.  No party would suffer any meaningful harm if the court deferred adjudication until such time. In  my view, the question whether the City could, consistent with the First Amendment, exclude Bronx Household from using school property under authority of Proposed SOP § 5.11 was therefore unripe for adjudication.  Accordingly, I vote to vacate the judgment.  *See National Park Hospitality Ass'n v. Dep't of*

*Interior*, 538 U.S. 803, 808 (2003) ("[T]he question of ripeness may be considered on a court's own motion.").

### BACKGROUND

New York Education Law § 414 authorizes local school boards to permit the use of school facilities by outside groups for, among other activities, "social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community," as long as such meetings are "non-exclusive" and "open to the general public." New York Educ. L. § 414(1)(c). Pursuant to this law, the Board of Education promulgated a written policy permitting the use of school facilities by outside groups for these "social, civic and recreational" meetings. Standard Operating Procedure § 5.6.2. The written policy also included Standard Operating Procedure ("SOP") § 5.9, which prohibited the use of school property for "religious services or religious instruction on school premises after school."[1] *Bronx Household of Faith v.*

---

[1]  SOP § 5.9 provided:

No outside organization or group may be allowed to conduct religious services or religious instruction on school premises after school. However, the use of school premises by outside organizations or groups after school for the purpose[] of discussing religious material or material which contains a religious viewpoint or for distributing such material is permissible.

*Bronx Household of Faith v. Community School District No. 10*, 127 F.3d 207, 210 (2d Cir. 1997).

-42-

*Community School District No. 10*, 127 F.3d 207, 210 (2d Cir. 1997) ("*Bronx Household I*").

Bronx Household describes itself as an "urban church whose primary purpose is to bring the Gospel of Jesus Christ to the streets of New York." *See* The Bronx Household of Faith, http://www.bhof.org/bhof1.html (last visited June 22, 2007). The current dispute between Bronx Household and the City began in 1994, when Bronx Household applied to use space in a middle school located in Community School District Number 10 for its Sunday morning meetings. *Bronx Household I*, 127 F.3d at 211; *Bronx Household of Faith v. Board of Education*, 331 F.3d 342, 345 (2d Cir. 2003) ("*Bronx Household II*"). Concluding that the activities described in Bronx Household's application would constitute "religious services or religious instruction" and would therefore violate § SOP 5.9, the City denied Bronx Household's application. *Bronx Household I*, 127 F.3d at 211.

Bronx Household brought suit to challenge the denial. The district court found no First Amendment violation and thus granted summary judgment in favor of the Board and School District. *Bronx Household of Faith v. Community School Dist. No. 10*, No. 95 Civ. 5501, 1996 WL 700915, at *6 (S.D.N.Y. Dec. 5, 1996). On appeal, we affirmed the judgment. *Bronx Household I*, 127 F.3d at 217. We found that the Board and School District had created a limited public forum by opening school facilities only to certain types of

-43-

speakers and subjects, and that the exclusion of religious services and religious instruction was viewpoint neutral and reasonable in light of the purposes served by the forum. *Id.* at 211-15; *see also id.* at 215 ("[R]eligious worship services may well be considered the ultimate in speech from a religious viewpoint in an open forum. But the question is whether a distinction can be drawn between it and other forms of speech from a religious viewpoint that District # 10 has elected to allow in the limited forum of a public middle school. We think it can.").

The Supreme Court denied certiorari, *Bronx Household of Faith v. Board of Education*, 523 U.S. 1074 (1998), and the dispute then lay dormant for some years. It was resurrected in 2001, after the Supreme Court issued its decision in *Good News Club*, which was arguably incompatible with our decision in *Bronx Household I*.

In *Good News Club*, the Supreme Court ruled that it was unconstitutional for another school district in the State of New York to exclude from its facilities a "private Christian organization for children ages 6 to 12" which had requested permission to use the school during afterschool hours to sing songs, read Bible lessons, memorize scripture, and pray. 533 U.S. at 103. Milford Central School had enacted a "community use policy" similar to the City's Standard Operating Procedures, whereby school facilities could be used for "social, civic and recreational meetings and entertainment events, and other uses

-44-

pertaining to the welfare of the community, provided that such uses shall be nonexclusive and shall be opened to the general public," but could not be used "by any individual or organization for religious purposes," which school district officials interpreted as prohibiting "religious worship" or "religious instruction." *Id.* at 103-04 (quotation marks omitted). Noting that "any group that 'promote[s] the moral and character development of children' is eligible [under Milford's policies] to use the school building," and that "the [Good News] Club teaches morals and character development to children," albeit from "a religious standpoint," the Court concluded that exclusion of the Good News Club from school facilities was unconstitutional viewpoint discrimination, *id.* at 108-10 (first alteration in original).

Taking comfort from the Supreme Court's decision in *Good News Club*, Bronx Household again requested to use school facilities for Sunday services. *Bronx Household II*, 331 F.3d at 346. The application was again denied, pursuant to the same SOP (since renumbered as § 5.11). *Id.* at 346-48. Bronx Household again brought suit to challenge the denial. This time the district court granted a preliminary injunction, provisionally requiring the City defendants to allow Bronx Household to use the school during the pendency of the litigation. *Bronx Household of Faith v. Board of Education*, 226 F. Supp. 2d 401, 427 (S.D.N.Y. 2002). On appeal, we affirmed the preliminary injunction. *Bronx Household II*, 331

F.3d at 354.

Bronx Household then moved in the district court for summary judgment to convert the preliminary injunction into a permanent ruling. The City cross-moved for summary judgment in its favor. Up to this point, all adjudications had been with reference to SOP § 5.9, renumbered as SOP § 5.11 (in other words, Old SOP § 5.11). The City, however, wrote to the district court advising that the City "seek[s] to implement a policy with language that varies from the policy language that has been preliminarily enjoined." The City explained that in contrast with the old rule, which prohibited use of school property for "religious services or religious instruction," the Proposed SOP § 5.11 would prohibit use of school property for "religious worship services, or otherwise using a school as a house of worship."[2] The City told the court that with respect to the motions for summary judgment, the City would be defending the new policy. The district court expressed doubt whether, given Article III's limitations on federal court

---

[2] Proposed SOP § 5.11 provides:

> No permit shall be granted for the purpose of holding religious worship services, or otherwise using a school as a house of worship. Permits may be granted to religious clubs for students that are sponsored by outside organizations and otherwise satisfy the requirements of this chapter on the same basis that they are granted to other clubs for students that are sponsored by outside organizations.

*Bronx Household of Faith v. Board of Educ. of City of New York*, 400 F. Supp. 2d 581, 588 (S.D.N.Y. 2005).

jurisdiction, it could properly rule on the constitutionality of a proposed SOP, which had not been invoked against Bronx Household. Seeking to allay the court's doubts, the City explained in a letter:

> Should [the City] defendants prevail in their motion for summary judgment and the preliminary injunction Order be vacated, then any future application by [Bronx Household] to hold their worship services at P.S. 15 . . . will be denied [pursuant to the proposed SOP].

*Bronx Household of Faith v. Board of Educ. of City of New York* ("*Bronx Household III*"), 400 F. Supp. 2d 581, 588 (S.D.N.Y. 2005) (quoting the City's letter of August 17, 2005).[3] The district court was thereby persuaded that it was presented with a justiciable controversy involving the application of Proposed SOP § 5.11. The court then granted summary judgment in favor of Bronx Household, permanently enjoining the City from enforcing the proposed SOP against Bronx Household. *Id.* at 601. The City defendants then brought this appeal.

---

[3] The letter stated:

> Plaintiffs' use of P.S. 15 for the Bronx Household of Faith's regular worship services is prohibited under the revised section 5.11. Defendants are not currently enforcing the revised section 5.11 (or advising the field of this change) because of the preliminary injunction Order that was entered in this case. Should defendants prevail in their motion for summary judgment and the preliminary injunction Order be vacated, then any future application by plaintiffs to hold their worship services at P.S. 15 or any other school will be denied.

*Bronx Household III*, 400 F. Supp. 2d at 588.

-47-

**DISCUSSION**

In my view, the district court's first instincts were sound, and the court was led astray by the City's speculation on possible future adoption and enforcement of the proposed SOP.  In my view, no ripe dispute involving the enforcement of Proposed SOP § 5.11 was before the court.

## I.  Principles of Standing and Ripeness That Apply to This Case

Article III of the Constitution limits the judicial power of the federal courts to the adjudication of "cases" and "controversies."  Aspects of this generalized limitation are classified in terms of whether a plaintiff has *standing*, or whether a dispute is *ripe*.

Although standing itself has multiple aspects, *see Flast v. Cohen*, 392 U.S. 83, 99 (1968) (noting that standing has been called one of the most amorphous concepts in public law), its "core component" is that, in order to have claims adjudicated by a federal court, the plaintiff  "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief," *Allen v. Wright*, 468 U.S. 737, 751 (1984).  While the requirements implicit in the notion of "injury" are "not susceptible of precise definition," *id.*, they have been described in terms of whether the plaintiff has a "personal stake in the outcome," and whether the injury in question

-48-

is "particular [and] concrete," and whether it results "direct[ly]" from the defendant's actions, *United States v. Richardson*, 418 U.S. 166, 179-80 (1974) (quotation marks omitted). "It is an established principle that to entitle a private individual to invoke the judicial power [of the United States courts] to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public." *Id.* at 177-78 (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937) (quotation marks omitted)).

Ripeness overlaps in some respects with standing, "most notably in the shared requirement that the [plaintiff's] injury be imminent rather than conjectural or hypothetical," *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006), and courts at times use either term to refer to this requirement. Nonetheless, the central concerns of ripeness doctrine are somewhat distinct from standing. Standing, in its "fundamental aspect," "focuses on the party seeking to get his complaint before a federal court" and whether that party suffers a sufficiently direct and concrete injury to be heard in complaint. *Flast*, 392 U.S. at 99. By contrast, the fundamental concern of ripeness is whether *at the time* of the litigation the issues in the case are "'fit' for judicial decision." *National Park Hospitality*

*Ass'n v. Dep't of the Interior*, 538 U.S. 803, 814 (2003) (Stevens, J., concurring); *see also Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974) ("ripeness is peculiarly a question of timing"). The concept of ripeness assumes that the relationship between the parties might at some point ripen into an injury sufficiently direct and realized to satisfy the requirements of Article III standing. It recognizes, however, that some disputes mature in stages, going through preliminary phases during which the injury is as yet but a speculative possibility, too remote or hypothetical to warrant present submission to a federal court. Such a dispute is considered as yet "unripe" for adjudication.

In the present dispute, there can be no doubt that if the City were to reject Bronx Household's application to use school property on the ground that such use would violate Proposed SOP § 5.11, Bronx Household's claim that such a rejection violates the First Amendment would fully satisfy the requirements of standing and ripeness. In those circumstances, the City's invocation of its SOP to deny a permit would be causing an immediate, direct, and concrete injury to Bronx Household. The concern I express is whether any dispute over the application of Proposed SOP § 5.11 has as yet caused any ripe injury to Bronx Household. I accordingly will focus in the following discussion on those decisions which concern the ripeness of the dispute, regardless of whether they speak in terms of "ripeness" or of "standing."

In its leading case on these concerns, *Abbott Laboratories v. Gardner*, the Supreme Court explained that the "basic rationale" of the doctrine of ripeness is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" and to prevent "judicial interference" until the effects of a defendant's actions are "felt in a concrete way" by the plaintiffs. *Abbott*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977). As outlined in *Abbott*, the ripeness inquiry generally requires a federal court to consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149.

The plaintiffs in *Abbott*, who were proprietary pharmaceutical manufacturers, brought a challenge to a Food and Drug Administration regulation which required that each time a proprietary drug's brand name appeared on a label, the generic name had to be given as well. *Id.* at 138. The regulations, which were already in effect when the plaintiffs brought suit but had not been enforced against the plaintiffs in any way, carried heavy potential criminal and civil sanctions for violations. *Id.* at 151-52. The Court found that the claim was ripe for adjudication. It noted that the question presented was a "purely legal one," the regulation constituted "final agency action" within the meaning of the Administrative Procedures Act, *id.* at 149 (quotation marks

omitted), and the impact of the regulations on the plaintiffs was "sufficiently direct and immediate as to render the issue appropriate for judicial review," *id.* at 152. In particular, the Court noted that the regulation's mere existence put the plaintiffs "in a dilemma" – they had to either comply with the regulations, incurring substantial economic costs to alter their labeling in a manner likely to harm their sales, or risk severe sanctions. *Id.* For more or less the same reasons, the Court found that the plaintiffs had standing to sue. *Id.* at 154.

On the same day, the Supreme Court dismissed a companion case, *Toilet Goods Association v. Gardner*, 387 U.S. 158 (1967), which illustrates the flip-side of the coin. The plaintiffs, a group of cosmetics manufacturers, challenged an FDA regulation which required the plaintiffs to grant the agency access to inspect their manufacturing facilities, processes, and formulae. *Id.* at 161. The FDA had as yet made no demand under the regulations for access to the plaintiffs' facilities. A number of questions of application remained unresolved, including what enforcement problems the FDA had encountered that would justify such inspections, the reasons that the FDA Commissioner might give to justify a particular order of inspection, and the safeguards the agency would devise to protect trade secrets. *Id.* at 163-64. The Court dismissed the case as unripe, explaining: "We believe that judicial appraisal of these factors is likely to stand on a much

surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here." *Id.* at 164. Of special importance, the Court noted the lack of "hardship" to the parties from postponing judicial review until "more light may be thrown on the Commissioner's statutory and practical justifications for the regulation": "This is not a situation in which primary conduct is affected . . . . [N]o advance action is required . . . [and] no irremediable adverse consequences flow from requiring a later challenge." *Id.* at 164.

In *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993), a class of alien plaintiffs challenged certain Immigration and Naturalization Service regulations which had raised barriers to an undocumented alien's ability to obtain authorization for permanent residency. The Court found the issues presented to be unripe (at least as to some plaintiffs) largely because the regulations at issue, as in *Toilet Goods*, "impose[d] no penalties for violating any newly imposed restriction," but rather "limit[ed] access to *a benefit* . . . not automatically bestowed on eligible aliens." *Id.* at 58 (emphasis added). In other words, a plaintiff's claim was unripe unless the alien had taken all possible steps to gain access to the immigration benefit, and had been denied the benefit on account of the disputed regulation. *Id.* at 59.

Particularly illustrative is *National Park Hospitality Ass'n*

*v. Department of the Interior*, 538 U.S. 803 (2003). The plaintiff, an association of concessioners doing business in national parks, sought pre-enforcement review of whether a National Park Service regulation could exclude concession contracts from the protective reach of the Contract Disputes Act of 1978. *Id.* at 804-05. The Court concluded that the plaintiff's claims were not yet ripe. As in *Toilet Goods*, the Court noted the lack of hardship to the parties from delaying review, given that the regulation does not "command anyone to do anything or to refrain from doing anything," does not "grant, withhold, or modify any formal legal license, power, or authority," does not "subject anyone to any civil or criminal liability," and creates "no legal rights or obligations." *Id.* at 809 (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (quotation marks omitted)). The Court also found the issue unfit for judicial review, given the parties' explicit or implicit acknowledgment that different types of concession contracts might present different legal questions. *Id.* at 812. As a result, the Court found that "further factual development would 'significantly advance our ability to deal with the legal issues presented,'" and therefore adjudication should "await a concrete dispute about a particular concession contract." *Id.* (quoting *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 82 (1978)).

The concurring and dissenting Justices in *National Park* agreed

-54-

with the framework of the majority's ripeness analysis, while disagreeing with some of the majority's conclusions. The concurring opinion would have found that the case was ripe for review but that the plaintiff lacked standing. *See National Park*, 538 U.S. at 814-17 (Stevens, *J.*, concurring). Justice Breyer's dissenting opinion would have found that the dispute satisfied both standing and ripeness requirements. In his view, the challenged regulation "causes a present injury" that is "immediate" and "concrete," in the form of higher contract implementation costs which force concessioners bidding for government contracts to pay more to obtain a contract than they believe it is worth. *Id.* at 818-19 (Breyer, *J.*, dissenting).

In concluding that a case is "unripe," courts often mean that the dispute has not yet matured into a "case" or "controversy" within the meaning of Article III, so that the court is without jurisdiction to enter judgment. *See, e.g.*, *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999) (describing and applying ripeness analysis as a constitutional prerequisite, without discussing prudential concerns). Courts have also, however, invoked the ripeness doctrine to justify dismissal in circumstances where adjudication would not necessarily have exceeded the courts' constitutional power but the prospect of injury was nonetheless sufficiently remote or conjectural that the court considers it prudent not to exercise jurisdiction until the

dispute has further ripened to produce a more palpable injury. *See, e.g.*, *Simmonds v. I.N.S.*, 326 F.3d 351, 358, 361 (2d Cir. 2003) (finding that plaintiff's claims "surely present a live case or controversy," but dismissing the petition on the grounds of prudential unripeness). Although in many cases courts fail to employ a strict taxonomy distinguishing constitutional from prudential considerations, *see, e.g.*, *National Park*, 538 U.S. at 808 (noting simply that ripeness doctrine derives from Article III and from prudential considerations), other courts have distinguished "prudential unripeness" from "constitutional unripeness," *see Simmonds*, 326 F.3d at 357.[4]

---

[4] In *Simmonds* we explained these two aspects of ripeness as follows:

> These two forms of ripeness are not coextensive in purpose. Constitutional ripeness is a doctrine that, like standing, is a limitation on the power of the judiciary. It prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it. But when a court declares that a case is not prudentially ripe, it means that the case will be *better* decided later and that the parties will not have constitutional rights undermined by the delay. It does not mean that the case is not a real or concrete dispute affecting cognizable current concerns of the parties within the meaning of Article III. Of course, in deciding whether "better" means later, the court must consider the likelihood that some of the parties will be made worse off on account of the delay. But that, and its degree, is just one – albeit important – factor the court must consider. Prudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of,

The ripeness principles elaborated in the foregoing cases bear heightened importance when, as in the present case, the potentially unripe question presented for review is a constitutional question. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105 (1944). The principle of constitutional avoidance is an integral part of the ripeness analysis in such cases, and tilts the balance in favor of finding a constitutional issue unripe for review. *Poe v. Ullman*, 367 U.S. 497, 503-04 (1961) ("The various doctrines of 'standing,' 'ripeness,' and 'mootness' . . . are but several manifestations – each having its own 'varied application' – of the primary conception that federal judicial power is to be exercised to strike down legislation, whether state or federal, only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action." (footnotes omitted)).  In cases involving the constitutionality of state

especially, constitutional issues that time may make
easier or less controversial.

*Simmonds*, 326 F.3d at 357.  It is unclear to me why the *Simmonds* Court believed that prudential ripeness requires that the parties "will not have *constitutional* rights undermined by the delay." In my view, the undermining of any rights, and not only constitutional rights, argues against a finding of unripeness.

legislation the Supreme Court has therefore warned federal courts to consider, before passing on the merits of the question, whether "questions of construction, essentially matters of state law, remain unresolved or highly ambiguous." *Rescue Army v. Municipal Court of City of Los Angeles*, 331 U.S. 549, 568, 574 (1947); *cf. Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997) ("Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court."). Jurisdiction should be exercised in such cases only when the constitutional issues are presented "in clean-cut and concrete form, unclouded by any serious problem of construction." *Rescue Army*, 331 U.S. at 584.

## II. Adjudication of Proposed SOP § 5.11

The circumstances confronted by the district court when asked to rule on the constitutionality of Proposed SOP § 5.11 are those which have led courts to the conclusion that the case was unripe for adjudication.

## A. Lack of Present Harm to the Party Opposing the Regulation

To start with two obvious propositions: (1) There is without question a ripe controversy between the parties involving the application of Old SOP § 5.11 to bar Bronx Household from using school property. The fact, however, that one controversy between the parties is ripe for adjudication does not mean that all disputes between the parties present ripe questions. Without doubt the district court could properly have entered a final judgment on the constitutionality of Old SOP § 5.11. It is the adjudication of the constitutionality of the new proposed SOP that is problematic. (2) Had Proposed SOP § 5.11 been invoked by the City as the basis for denying Bronx Household use of school property, Bronx Household would have standing to challenge its constitutionality, and the dispute would be ripe for adjudication. This, however, has not happened. In fact, it appears the proposed SOP has not even been adopted, and that the City is awaiting the court's judgment on its constitutionality before adopting it.

Not only has the City never relied on Proposed SOP § 5.11 to deny Bronx Household's application, but Bronx Household has never even applied to use school property under the standards of Proposed SOP § 5.11. Bronx Household has been excluded under the standards of the predecessor SOP and has obtained a preliminary injunction granting it provisional access to school property on the basis of the probable unconstitutionality of that SOP. At

-59-

present Bronx Household is therefore not being excluded from the schools at all, much less by reason of the proposed SOP.

I recognize that a regulation can cause harm to a covered entity even without being enforced. Thus in *Abbott* the Supreme Court found that the FDA's labeling regulation caused actual harm to covered drug manufacturers even without being enforced, because the manufacturer was required either to adopt a disadvantageous change in its labeling practices or risk incurring serious penalties and liabilities. *See Abbott*, 387 U.S. at 153 ("[W]here a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts . . . must be permitted . . . ."); *see also AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 386 (1999) ("When . . . there is no immediate effect on the plaintiff's primary conduct, federal courts normally do not entertain pre-enforcement challenges . . . ."); *Texas v. United States*, 523 U.S. 296, 301 (1998) (no "hardship" because plaintiff "is not required to engage in, or to refrain from, any conduct"). And in *National Park*, the majority and the dissent disagreed over whether the obligation on would-be concessioners to increase their bids in anticipation of increased operating costs resulting from the questioned regulation caused sufficient injury to confer ripeness on the concessioners' challenge to the regulation.

Here, the City's proposed adoption of a new SOP causes no

-60-

such harm to Bronx Household. Even if the proposed SOP had been adopted, Bronx Household would not be obligated by it to amend its practices in any way. The provision would not command Bronx Household to do anything or to refrain from doing anything, nor would it grant, withhold, or modify any legal license, power, or authority, nor would it subject Bronx Household to civil or criminal liability. *See National Park*, 538 U.S. at 809. The proposed SOP would merely create a possibility that at some future time, it may cause Bronx Household to be excluded from use of the schools – at which time Bronx Household could challenge its constitutionality. *See Simmonds*, 326 F.3d at 360 ("The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship.").

### B. Lack of Harm to Either Party from Delay

Among the factors courts examine to determine ripeness is whether *either* party to the dispute would be harmed by delaying adjudication until the dispute ripens. I think it clear that neither party would be harmed by delay in adjudicating the constitutionality of Proposed SOP § 5.11. Bronx Household continues to be protected by the preliminary injunction, and there is no impediment to the entry of final judgment relating to the SOP that was actually enforced against it (Old SOP § 5.11). The City will suffer no harm if adjudication of the constitutionality

of Proposed SOP § 5.11 awaits such time as it is actually adopted and invoked. The parties may find it convenient to get this resolved now. But loss of such convenience is not sufficient harm to make a hypothetical future dispute ripe for immediate adjudication.

In a deviation from the conventional pattern, it is the governmental entity sponsoring the regulation, rather than the person potentially affected, that has asked that the lawfulness of the regulation be immediately adjudicated. However, the City is not barred from vindicating its governmental interest by adopting and enforcing the proposed standard against Bronx Household. The preliminary injunction, which was in effect when the parties cross-moved for summary judgment, barred the City from excluding Bronx Household *under the old rule*. It did not purport to bar the City from adopting or enforcing different standards.[5]

[5] The preliminary injunction barred the defendant "from enforcing the [Old SOP § 5.11] so as to deny plaintiffs' application." It contained no suggestion that the City was barred from adopting or enforcing a new, different standard. The Order stated:

> It is hereby ordered, adjudged and decreed that, for the reasons set forth in the Opinion dated June 26, 2002, defendants are hereby enjoined from enforcing the New York City Board of Education's Standard Operating Procedure § 5.11 [Old SOP § 5.11] so as to deny plaintiffs' application to rent space in a public school operated by the Board of Education for morning meetings that include religious worship or the application of any similarly-situated individual or entity.

(Although this has little or no bearing on the present

When the City's attorney expressed a concern that the preliminary injunction might bar the City from enforcing the new policy, the district court judge responded, "I don't recall that the injunction prohibited the [Department of Education] from changing its policy." If the City still entertained doubts about a risk of contempt, it could have sought further assurance from the district court.[6]

By asking the court to rule on the constitutionality of a policy that had neither been enforced nor even adopted, the City was essentially asking for an advisory ruling on courses of action it had contemplated but not taken. The City was asking the court:

dispute, I question the appropriateness of the district court's grant of injunctive relief barring the City not only from denying the application of the plaintiffs, but also from denying the application of "any similarly-situated individual or entity." Assuming such an order may be proper in some circumstances (even absent class certification), *cf. Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir. 1973), I believe it was not appropriate in this case, at least without the court also giving a reasonably precise definition of the meaning of "similarly-situated." There are many grounds upon which the City might reject another entity's permit application, which might raise altogether different issues than those involved in Bronx Household's case. A defendant ought not to be subjected to the risk of contempt without a reasonably clear delineation of the circumstances in which the defendant is forbidden to act.)

[6] In the unlikely event that the district court would have advised the City that the court would regard such action as a violation of the injunction, the City would then have been armed with an argument supporting ripeness to adjudicate the constitutionality of the new SOP, as the City would then have been harmed by denial of the opportunity to enforce the new standard pending final adjudication of the constitutionality of the old.

*if* the City adopts the proposed SOP, and *if* Bronx Household applies to use school space under that new provision, and *if* the City denies that permit application on the grounds that Bronx Household plans to use the school space for "worship," would that denial be constitutional? To answer would be to give an advisory opinion on a hypothetical question.

### C. Fitness For Adjudication

The circumstances that have led courts to find that issues are unfit for adjudication are present here. The proposed SOP, focusing on the exclusion of "worship," has played no role in the exclusion of Bronx Household from use of the school facilities. Furthermore, adjudication of the constitutionality of the new SOP would be illuminated by the resolution of questions that will inevitably come into play if and when the City enforces the proposed SOP upon Bronx Household's application. *See Toilet Goods*, 387 U.S. at 164. In *Toilet Goods*, *Reno*, and *National Park*, the Supreme Court determined that adjudication of the legal question was unripe in part because the adjudication would benefit from having the "factual components fleshed out" by "some concrete actions applying the regulation." *National Park*, 538 U.S. at 808 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990) (quotation marks omitted)).

The same considerations apply here. It is impossible to know

-64-

at this stage exactly how the process of Bronx Household's application and the City's ruling will play out when so much remains uncertain. For starters, how will Bronx Household describe its proposed activities in an application designed to secure admission under this policy focused on worship? One cannot assume that a new application seeking approval under the new SOP will be formulated in the same terms as Bronx Household's previous applications, which were addressed to different standards. The term "worship," which did not appear in the old SOP but is central to the new one, is of uncertain meaning. I recognize that, when worship was not determinative, Bronx Household described the activities for which it sought permission as "worship." It will not necessarily continue to do so when seeking admission under a rule which explicitly excludes "worship." In any event, what will matter on a new application is not whether *Bronx Household* considers its activities to be "worship," but whether its activities are "worship" *within the meaning of the City's new SOP*. It is uncertain how the City will interpret its new criterion. Will the City formulate guidelines to help determine what does and what does not constitute forbidden worship? How will the City define the term in passing on applications?

After the Supreme Court's decision in *Good News Club*, the constitutional significance of "worship" is far from clear. In a footnote responding to Justice Souter's observation in dissent

-65-

that the Good News Club's activities added up to "an evangelical service of worship," the majority asserted that the activities "do *not* constitute *mere religious worship*, divorced from any teaching of moral values." *Good News Club*, 533 U.S. at 112 n.4 (emphasis added); *see also id.* at 138 (Souter, *J.*, dissenting). Later in the same footnote, the Court acknowledged Justice Souter's characterization of the Club's activities as "worship," but responded simply that "[r]egardless of the label Justice Souter wishes to use, what matters is the substance of the Club's activities . . . ." *Id.* at 112 n.4.

The Court's insistence that Good News Club's activities did not constitute "mere worship" seems to indicate that the Court attaches constitutional significance to whether "worship" was involved, and may even suggest, as Judge Calabresi notes, that the Supreme Court will ultimately conclude that worship may be excluded, while associated teaching of moral values may not. *See* Calabresi Op., *supra* at **26.** Otherwise, there would be little point in distinguishing the Club's activities from "mere worship." On the other hand, the Court's dismissal of Justice Souter's characterization of the activities as "worship" as essentially irrelevant may suggest it is constitutionally irrelevant whether an applicant to use public school facilities intends to conduct worship services. *Cf.* Walker Op., *post* at **93.**

When and if the City faces Bronx Household's application to

use school facilities under Proposed SOP § 5.11, given the City's obligation to act consistently with the Constitution, it will need to interpret the Supreme Court's First Amendment position. Perhaps by that time the Supreme Court will have given additional guidance. The City will have to determine the meaning of "worship" as used in the new SOP, and do so in consideration of whatever light new court rulings may have shed on the puzzling ambiguities of the footnote in *Good News Club*. Before a federal court adjudicates whether the City's exclusion of "worship" is constitutionally permissible, it would be useful to know how the City construes excluded "worship," and the best way to find out is to wait until the City relies on its rule to deny an application. Until the City denies Bronx Household's application based on a policy forbidding "worship," there is no ripe question of the constitutionality of such an action.

Because the central question in the dispute is one of constitutionality, the importance of the conclusion that the present dispute is not yet fit for adjudication is heightened by the general rule counseling against deciding *constitutional* questions unnecessarily. This court has been asked to adjudicate a significant and delicate question of constitutional law, whose outlines are by no means clearly dictated by prior authority; the answer may turn in part on how the City interprets and enforces its policy. This is exactly the type of question the court should

not reach out to decide prematurely, when many factors which may influence the analysis are as yet undeveloped. As the Supreme Court noted in *Spector Motor Service*:

> [A]s questions of federal constitutional power have become more and more intertwined with preliminary doubts about local law, we have insisted that federal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding local law. Avoidance of such guesswork . . . merely heeds this time-honored canon of constitutional adjudication.

*Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944) (citations omitted). In the present case the constitutional question may be substantially altered – or even mooted entirely – by whether the City ever enforces Proposed SOP § 5.11 and, if so, the manner in which enforcement proceeds.

It would in no way answer these ripeness concerns to say that, because the constitutionality of the City's Proposed SOP will need to be decided soon, we might as well decide it now rather than make the parties wait. There are at least two strong responses to any such argument. For starters, the question whether Proposed SOP § 5.11 embodies prohibited viewpoint discrimination (as the district court found) may never be presented to the court. Second, and more important, the ripeness doctrine assumes that the question may well need to be decided in the future, but nonetheless avoids premature decision based on the belief that the adjudication will be better informed and wiser if it occurs when the dispute has crystallized, thus bringing its

latencies to the surface. I discuss these two considerations below.

Courts that have dismissed on the grounds of unripeness have noted that, as the dispute among the parties advances, the unripe issue may become moot and thus may never be presented to a court, or alternatively may be presented in a much altered form. *See Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1217 (9th Cir. 2006) (en banc) (three-judge plurality opinion) (finding the case unripe because, in part, "[w]e are . . . uncertain about whether, or in what form, [the] question might be presented to us"); *Simmonds v. I.N.S.*, 326 F.3d 351, 357 (2d Cir. 2003) (Calabresi, *J.*) ("Prudential ripeness is . . . a tool that courts may use . . . to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial."). In this case as well, there is a significant possibility that the constitutional issue which the district court undertook to determine will be mooted by future events, and either will never be presented for adjudication or will be presented in a substantially different form. Notwithstanding the City's facile prediction that it would deny Bronx Household's future applications under the proposed SOP, there are many other reasonable possibilities. Among them: The City's administration,

whose composition inevitably will change over time, might adopt a different approach. The City might become persuaded – perhaps by subsequent rulings of the Supreme Court or other courts – that it cannot constitutionally exclude worship, and might therefore decide not to adopt the proposed SOP, or it might grant Bronx Household's application notwithstanding the SOP. The City might grant Bronx Household's application in part, allowing it to use school facilities for some of its projected activities – those the City recognizes are protected by *Good News Club* – but specifying that others – those which the City views as "worship" and beyond the protection of *Good News Club* – are not permissible. The free speech concerns underlying the district court's decision might also be mooted if the City concluded that, in practice, any attempt to enforce Proposed SOP § 5.11 would violate the *Establishment Clause* of the First Amendment, because of church-state entanglement resulting from the City's need to distinguish "worship" from other religious activities. *See Widmar v. Vincent*, 454 U.S. 263, 272 n.11 (1981) ("We agree . . . that the University would risk greater 'entanglement' by attempting to enforce its exclusion of 'religious worship' and 'religious speech.'"); *Bronx Household III*, 400 F. Supp. 2d at 598 (merely identifying "religious worship services" fosters "an excessive government entanglement with religion"); *see* Walker Op., *post* at **95**. Or, as noted above, for any of a number of reasons, Bronx Household might

-70-

never reapply.

Furthermore, in denying Bronx Household's future application the City might also rely on a ground which either moots the constitutional inquiry or at least alters the constitutional calculus. The New York statute authorizing the Board to open its schools for public use for "social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community" specifies that such uses "*shall be non-exclusive and shall be open to the general public.*" New York Educ. L. § 414(1)(c) (emphasis added).[7] While Bronx Household has described its meetings as "open to the public," the City has questioned this characterization, and the evidence already adduced suggests that Bronx Household's meetings may not be open to the public. It appears, for instance, that Bronx Household has "excommunicated two Church members since they began meeting at P.S. 15," and that an excommunicated member "is not permitted to attend [Bronx Household's] services, unless the person seeks to be restored to the Church." Grounds for discipline include publicly advocating the Islamic religion. Furthermore, Bronx Household's Pastor has also testified that "communion," which is part of Bronx

---

[7] Although in *Bronx Household I* we dismissed the relevance of the possibly exclusive nature of Bronx Household's meetings, we did so in the context of upholding on other grounds the City's denial of a permit to Bronx Household. *See Bronx Household I*, 127 F.3d at 215. The discussion did not imply that exclusivity could not furnish an alternate ground for the City's denial.

Household's typical Sunday service, is not given to "people who have not been baptized." For these and other reasons, there may therefore be a substantial question whether Bronx Household's meetings are truly "open" to people who reject Christianity.

If such evidence were further developed, it is reasonably possible that upon Bronx Household's future application under the proposed SOP the City would deny access on the ground that Bronx Household's Sunday meetings are out of compliance with New York's statutory mandate that all meetings be "non-exclusive" and "open to the general public." New York Educ. L. § 414(1)(c). Were the City to exclude Bronx Household on this basis, the question whether the City may constitutionally exclude "worship" would in all likelihood be mooted. *Cf. Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995) (even in a "public forum" the state may regulate protected expression with "reasonable, content-neutral time, place, and manner restrictions").

The fact that the proposed provision has never been applied against Bronx Household and may never be applied as the basis for excluding the group from school facilities counsels strongly in favor of finding the question of its constitutionality unfit for judicial review. *See Simmonds*, 326 F.3d at 359 (fitness analysis "is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur" (quoting *Isaacs v. Bowen*, 865 F.2d 468, 478 (2d Cir.1989) (quotation marks omitted));

*Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 79 F.3d 1298, 1305 (2d Cir. 1996) ("The [ripeness] doctrine prevents the premature adjudication of issues that may never arise."). Refraining from decision on issues that may never materialize is particularly important where the underlying issue, as here, is of constitutional import. *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

Even if it were certain that the constitutionality of Proposed SOP § 5.11 would be back before the court, that is not a reason to decide that question prematurely, before a dispute over the application of the SOP has crystallized or caused harm. The ripeness doctrine seeks better information and thus improved accuracy in decision making. As discussed above, there are many ways in which the constitutional question may be shaped and informed by the manner in which the City chooses to apply and interpret its proposed policy. We cannot anticipate the exact form this dispute will take when it ripens into an actual conflict. The ripeness doctrine requires that our decision await that time (even if it is in the near future), because the issue will be better illuminated when the contours of the conflict are clear. At this stage, the particulars of the dispute between Bronx

Household and the City regarding the new proposed SOP are a matter of speculation.

A finding that Bronx Household's meetings are not open to the public or that it refuses sacraments based on whether the person professes the Christian faith might also present a different constitutional issue. The Supreme Court found in *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), that the school did not violate the Establishment Clause by permitting religious groups to use school facilities because the activity "would not have been during school hours, would not have been sponsored by the school, *and would have been open to the public, not just to church members*. The District property had repeatedly been used by a wide variety of organizations. *Under these circumstances* . . . there would have been no realistic danger that the community would think that the District was endorsing religion . . . ." *Id.* at 395 (emphasis added). Again, in *Capitol Square Review and Advisory Board v. Pinette*, a plurality of the Court repeated these sentiments: To permit "access by a religious group in *Lamb's Chapel*, it was sufficient that the group's activity was not in fact government sponsored, that *the event was open to the public*, and that the benefit of the facilities was shared by various organizations." 515 U.S. 753, 767 (1995) (plurality opinion) (emphasis added). Finally, in *Good News Club* the Court rejected the defendant's Establishment Clause

defense by noting: "As in *Lamb's Chapel*, the Club's meetings were held after school hours, not sponsored by the school, and *open to any student who obtained parental consent, not just to Club members*." 533 U.S. at 113 (emphasis added); *cf. id.* at 144 (Souter, *J.*, dissenting) (permitting Good News Club to meet on school property might result in an Establishment Clause violation, in part because "[t]he club is open solely to elementary students (not the entire community, as in *Lamb's Chapel*)").

These cases may suggest that there is a constitutional requirement that religious meetings conducted on public school property be "open to the public," and that would-be recipients not be denied sacraments on the basis of their failure to espouse the tenets of a particular faith, lest such exclusions be perceived as state "endorsement" of a particular faith. *Cf. Lamb's Chapel*, 508 U.S. at 395. Were the City to permit Bronx Household to use school facilities to perform activities such as communion only for those of a certain faith, or to close the school doors to persons who reject Christianity, this might well be deemed a violation of the Establishment Clause. *Cf. Good News Club*, 533 U.S. at 113 ("[I]t is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination.").

In any event, the possibility that the City's response to an application under the proposed SOP might be affected by such

-75-

considerations, such that the provision will never be applied in the manner currently anticipated by the parties (if at all), argues against the fitness of the question for present adjudication. Courts do not rush to adjudicate unripe disputes, especially those involving constitutional questions, because judgments on important questions will be better informed and sounder if they await the time when the dispute has crystallized and a party has suffered harm.[8]

---

[8] My colleagues offer a number of arguments in favor of a finding of ripeness. I do not find them convincing. Judge Calabresi, acknowledging that it is a "close" question, argues as follows. First, he contends the record reflects actual promulgation of the revision and adds that the district court "must be taken to have found" that the City adopted the rule. Nothing in the district court's discussion suggests that the court made such a finding; furthermore, when the court raised the ripeness concern, counsel for the City acknowledged that while the revision had been "approved at the highest levels of the Department," it had neither been "implemented" nor "applied . . . to the plaintiffs." The City subsequently acknowledged that it was "not currently enforcing the revised section 5.11" nor even "advising the field of this change." *Bronx Household III*, 400 F. Supp. 2d 581, 588 (S.D.N.Y. 2005).

More importantly, however, my finding of unripeness does not turn on whether the revision was adopted by the Board as an SOP. It is undisputed that the revision was never applied against Bronx Household. While the apparent failure of the City to promulgate the revision formally makes the unripeness of the dispute more obvious, my conclusion would be the same, for the reasons expressed throughout this opinion, regardless of whether the revision was adopted but not invoked against Bronx Household, or not even adopted. The most important factor is that the revision caused Bronx Household no harm.

Judge Calabresi seems to concede that this revision of the SOP has caused no harm to Bronx Household; at least he makes no argument to the contrary. He argues that ripeness may be found on two bases: first, that a finding of unripeness would further delay the ultimate resolution of the dispute, and second, that the City should be entitled to get a ruling on the constitutionality of the revision, even before applying it,

because the City might have believed that the terms of the preliminary injunction prohibited the City from enforcing it.

As for the delay, there are two answers. First, the delay necessary to await a true ripe conflict over the revised SOP need not have been lengthy. Had the district court declined to adjudicate the constitutionality of the revised SOP until the City invoked it to exclude Bronx Household, and the parties desired speedy resolution, the resulting delay would have been extremely brief. If, instead of trying to convince the court to adjudicate the constitutionality of a rule that had never been enforced, the City had advised the court that it was adopting a different standard, and invited Bronx Household to apply under the new standard, Bronx Household could then have promptly submitted an application, and the City could have promptly ruled. The parties could then have cross-moved for summary judgment. Any delay in the court's ruling until a true adversity developed between the parties over a new standard thus need not have exceeded a few weeks. Second, and more important, resultant delay of adjudication is ordinarily not the kind of harm that renders an unripe claim ripe. Delay is an *inevitable* consequence whenever a court declines to adjudicate a question by reason of unripeness. In several cases discussed in the body of this opinion, the Supreme Court and this court have declined to adjudicate because of the unripeness of the question, notwithstanding that the refusal to adjudicate would cause the parties delay in securing an answer to the question. If such delay conferred ripeness, no case would ever be unripe for adjudication.

Judge Calabresi finally argues that ripeness can be derived from the harm to the City of being barred by the preliminary injunction from implementing its newly revised policy. As explained more fully in earlier passages of this opinion, the terms of the preliminary injunction simply did not forbid the City from revising its policy or from enforcing a policy different from the one enjoined. When the City's attorney advised the district court, "We did not believe that, in light of the preliminary injunction, that we could go forward [with implementation of the revised policy] without this court's approval," the court responded, "I don't recall that the injunction prohibited the DOE [Department of Education] from changing its policy." If the City had further qualms, it could have asked the judge for assurance.

Judge Walker argues that the issue is ripe because Bronx Household is harmed by an "*in terrorem* effect" of the revised rule – the *in terrorem* effect being that Bronx Household must concern itself that, if the revised standard is some day enforced against it, it would be forced to seek another location

-77-

**CONCLUSION**

The district court should not have entertained and adjudicated the question whether the City may constitutionally exclude Bronx Household from access to City school facilities under the provisions of Proposed SOP § 5.11. The question was not ripe for adjudication. It is unnecessary to determine whether this was prudential unripeness, constitutional unripeness, or both. The question was at least prudentially unripe. The court should have declined to jump ahead to make this premature adjudication. I therefore vote to vacate the judgment.

---

to conduct worship services. In support, Judge Walker cites the Supreme Court's decision in *Abbott*. However, the reason the Supreme Court found ripeness in *Abbott*, notwithstanding that the new regulations had not been enforced, was that the plaintiff drug manufacturers needed immediately either to adopt the disadvantageous labeling practices mandated by the regulation or risk serious punishments. Their vulnerability to punishment was crucial to the finding of ripeness. Here, there is no such thing. The revised SOP causes no harm to Bronx Household. It is free for the time being to conduct its worship services in the schools without any risk of punishment. The recognition that the revised SOP might some day be enforced to exclude Bronx Household from conducting its worship services in the schools causes it no present harm. If the mere possibility of future enforcement of a new rule were sufficient to confer ripeness, a governmental entity's mere adoption of a new rule would allow all persons who might some day be required by it to change their practices to challenge its lawfulness in federal court. This is clearly not the accepted standard of ripeness.

The arguments of my colleagues do not persuade me that a ripe controversy exists over the constitutionality of this revision of the City's SOP, which has clearly not been enforced and has caused Bronx Household no harm.

JOHN M. WALKER, JR., Circuit Judge, dissenting:

This dispute between the Bronx Household of Faith, a Christian church, and the New York City Board of Education is old and bitter. Bronx Household wishes to use school facilities for Sunday worship services; the Board wishes to keep them out and invokes a rule precluding groups who meet on school premises after hours from "holding religious worship services, or otherwise using a school as a house of worship." Standard Operating Procedures Manual § 5.11 ("SOP § 5.11").[1]

While I agree with Judge Calabresi that this dispute is ripe for adjudication, and join his opinion in that limited respect without reservation,[2] I cannot agree that SOP § 5.11 is viewpoint neutral. Indeed, after comparing the purposes of Bronx

---

[1] What is termed "Revised" SOP § 5.11 in the court's per curiam opinion, I call simply SOP § 5.11.

[2] I agree with Judge Leval that we should not reach out to decide unnecessary constitutional questions. The Board, however, has repeatedly and implacably sought to exclude religious viewpoints -- whether out of the mistaken belief that such exclusion is necessary to comply with the Establishment Clause or due to some hostility to religious groups. Indeed, this marks the third time that a New York school board has denied religious groups access to school property. Under these circumstances, and in light of the fact that I believe the Board has adopted SOP § 5.11, I think we owe the litigants a duty to decide this dispute now; the alternative would permit the Board to rely on the in terrorem effect of SOP § 5.11 to prevent Bronx Household from pursuing its principal goal -- the establishment of a community of believers -- as Bronx Household would need to account at every turn for the possibility that at any moment it might be forced to resume its peripatetic search for a building wherein to house its worshipers. Cf. Abbott Labs. v. Gardner, 387 U.S. 136, 152 (1967).

Household's proposed use of school property with the purposes for which the Board has opened that property to the public, I can only conclude that by promulgating SOP § 5.11 the Board has engaged in a form of invidious viewpoint discrimination forbidden by the First Amendment. With the history of this dispute in mind and in light of the Supreme Court's recent decision in Good News Club v. Milford Central School, 533 U.S. 98 (2001), I vote to affirm the district court's permanent injunction.

Rather than inquiring into the purposes of the proposed expressive activity and the purposes of the forum, Judge Calabresi follows a different analytical course, with which I cannot agree. Starting with the premise that in a "limited public forum" the government may restrict any expressive activity that does not "parallel" expressive activity the government has already chosen to permit, Judge Calabresi asks whether "worship [is] merely the religious analogue of ceremonies, rituals, and instruction [which the Board has chosen to permit], or . . . [whether it is] a unique category of protected expression." Calabresi Op., supra at **6**. He then completes the syllogism by holding that worship is sui generis, unlike expressive activity the Board has already chosen to permit, and thus impermissible. The result is Bronx Household's excommunication from the broad group of after-school users who are welcome on school property.

Judge Calabresi's approach is fatally defective in two

principal ways: (1) He fails to define the "limits" of the Board's limited public forum, rendering the comparison he draws between permitted expressive activity and Bronx Household's proposed expressive activity so indeterminate and malleable that its result is foreordained; and (2) He fails to articulate an <u>objective</u> definition of "worship," the term he uses to describe Bronx Household's proposed expressive activity, choosing instead to leave that task to the Board and thereby likely ensuring that the Board's entanglement in the process will violate the Establishment Clause.

The First Amendment is not like a book in the "Choose Your Own Adventure" series, in which it is easy -- albeit theoretically improper -- to select an outcome and, working backwards, decide how the plot and characters will develop; nor, for that matter, may we decline the adventure itself. The First Amendment does not teach Judge Calabresi's simple calculus. <u>Cf</u>. <u>Int'l Soc'y for Krishna Consciousness, Inc. v. Lee</u>, 505 U.S. 672, 693-94 (1992) (Kennedy, J., concurring) ("Our public forum doctrine ought not to be a jurisprudence of categories rather than ideas . . . ."). Because I agree with Judge Calabresi that we must decide this case, because I conclude that the Board has engaged in impermissible viewpoint discrimination, and because Judge Calabresi's approach relies more on judicial legerdemain than judicial reasoning, I must respectfully dissent from the court's

decision to vacate the permanent injunction.

**I. Bronx Household's Free Speech Claim**

**A. The Board's Viewpoint Discrimination**

Despite the two flaws in Judge Calabresi's approach, I begin with three points on which he and I are in agreement. I agree that in a limited public forum, the government may exclude all entities except those "entities of similar character" to those it has chosen to include, Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 48 (1983), as long as any such exclusion is not a facade for covert viewpoint discrimination, Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 812 (1985). Indeed, we have concluded, a limited public forum is (1) a sub-set of the designated public forum as to "expressive activities of [the] genre" the government has chosen to permit on its property, Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir. 1991), and (2) a sub-set of the nonpublic forum as to all other expressive activities. See also Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998) (holding that if the government excludes "a speaker who falls within the class to which a designated public forum is made generally available" its decision is subject to strict scrutiny). I also agree that we must be careful not to articulate a standard that would simply require that "any public school opened for civic meetings . . . [be] open[] for use as a church, synagogue, or mosque." Good News

Club, 533 U.S. at 139 (Souter, J., dissenting).  And, finally, I agree that courts should not analyze the "substance" of proposed expressive activity as the district court did in this case.  See Bronx Household of Faith v. Bd. of Educ. (Bronx Household III), 400 F. Supp. 2d 581, 591 (S.D.N.Y. 2005) (describing Bronx Household's proposed activity as "singing songs and hymns; teaching from the Bible.").  By deconstructing religious worship into components, the district court denigrates it.[3]

Judge Calabresi and I part ways, however, in how we propose to ascertain whether the Board is just excluding an entity dissimilar to those it has already chosen to permit on its premises or whether it is engaging in unlawful viewpoint discrimination.  I would compare the purposes of Bronx Household's proposed expressive activity to the purposes for which the Board has created its limited public forum and, if the fit is close, inquire searchingly of the government's motives.  This accords with the various cases Judge Calabresi cites in his opinion, but

---

[3] The district court's approach is also impractical, for if worship is merely the singing of hymns and reading from the Bible, the singing of hymns might be considered simply a vibration of the vocal chords; finally, the district court's approach seems in tension with the Supreme Court's decision in Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 109, 111 (1943) ("[T]he mere fact that the religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise.").  I note in passing that for these same reasons I fail to see how the Board could grant Bronx Household's putative future application in part while denying it in part.  Cf. Leval Op., supra at **70**.

barely analyzes. The Good News Club Court, for instance, emphasized purpose. Compare Good News Club, 533 U.S. at 108 ("Milford has opened its limited public forum to activities that serve a variety of purposes . . . .") (emphasis added), and id. ("[T]here is no question that teaching morals and character development to children is a permissible purpose under Milford's policy . . . ."), and id. at 109 (discussing "the [Lamb's Chapel] films' purpose"), with id. at 131 (Stevens, J., dissenting) (distinguishing discussion of "political issues from meetings whose principal purpose is to recruit new members to join a political organization") (emphasis added).[4] And our court has often deemed analysis of the parties' purposes essential to resolution of limited public forum cases. See Deeper Life Christian Fellowship, Inc. v. Bd. of Educ., 852 F.2d 676, 680 (2d Cir. 1988) (government's purpose relevant to determining whether property is public forum or nonpublic forum); Knolls Action Project v. Knolls Atomic Power Lab., 771 F.2d 46, 50 (2d Cir. 1985) (ostensible subject-matter restriction "impermissible [if] it was motivated [in fact] by a dislike of the content of [plaintiff]'s message").

More importantly, whether Bronx Household's proposed

---

[4] See also Rosenberger v. Rector & Visitors of the Univ. of Virginia, 515 U.S. 819, 829 (1995); id. at 846 (O'Connor, J., concurring) ("This insistence on government neutrality toward religion explains why we have held that schools may not discriminate against religious groups by denying them equal access to facilities that the schools make available to all.").

expressive activity constitutes "worship" can only be discerned by inquiring of that activity's purpose. See Welsh v. United States, 398 U.S. 333, 339 (1970) (accepting the subjectivity of "religious belief" and abjuring any objective definition of the term); United States v. Seeger, 380 U.S. 163 (1965) (same); cf. Murdock, 319 U.S. at 109 (noting evangelical purpose to sale of religious literature).

Under the approach most faithful to Supreme Court precedent, whether Pastor Hall chooses to label Bronx Household's proposed expressive activity a "worship service" is not determinative; we must independently examine the purpose of that activity. Compare McCreary County v. ACLU, 125 S. Ct. 2722, 2732 (2005) (discerning hidden religious purpose) with N. Pac. Union Conference Ass'n of the Seventh-Day Adventists v. Clark County, 118 Wash. App. 22, 28-29 (2003) (discussing whether "education" should be considered "'a vital part of the Church's worship program'" for tax purposes). Defendants' purpose in opening school property to the public is to improve "school-community relations in ways that can enhance community support for the school." Cahill Decl. ¶ 14; Farina Decl. at ¶ 9 (noting that the Board wishes to "expand enrichment opportunities for children and to enhance community support for the schools") (emphasis added). Simply put, defendants wish to foster a community in their geographic vicinity in ways that will inure to their benefit. Upon review of the record, Bronx

Household's proposed expressive activity fits within this paradigm. Bronx Household's essential purpose is the development of a community of believers, which has as its anticipated result increased community support for the school. See 1st Hall Dep. at 19, 20, 38, 46.

Because the fit between the government's purpose in opening the forum and the purpose of Bronx Household's proposed expressive activity is sufficiently close, more searching scrutiny of the government's motives is required. Cf. Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist., 426 F.3d 617, 631 (2d Cir. 2005) (Calabresi, J.) (postulating hostility to religion from teacher's conduct). The Board's avowed purpose in enforcing the regulation in this case, see Bronx Household III, 400 F. Supp. 2d at 599 (noting that "[t]he Board is quite candid in acknowledging its intent to 'reinstitute a policy that would prevent any congregation from using a public school for its worship services'"), and its long-standing hostility to religious groups, leads ineluctably to the conclusion that the Board, in fact, has undertaken to exclude a particular viewpoint from its property.

I acknowledge Judge Calabresi's concern that New York's schools not resemble St. Patrick's Cathedral. However, analysis of the parties' purposes does not raise that concern; it leaves the Board ample room to regulate the use of its property.[5] As the

---

[5] Moreover, because the Board has a compelling interest in avoiding Establishment Clause violations, it can exclude

-86-

Supreme Court explained in Good News Club, the government "may be justified 'in reserving [a forum] for certain groups.'" 533 U.S. at 106 (emphasis added); Perry, 460 U.S. at 49 ("We believe it is more accurate to characterize the access policy as based on the status of the respective unions . . . .") (emphasis added). The Board thus remains free to distinguish between outside speakers and student-sponsored groups (as indeed the text of SOP § 5.11 hints it may). Cf. Bronx Household III, 400 F. Supp. 2d at 600 n.18 (noting that the Board could "amend the SOPs to create a neutral distinction based on the speaker"). Moreover, the Board may also impose reasonable time, place or manner restrictions on Bronx Household.

**B. Two Flaws in Judge Calabresi's Reasoning**

Judge Calabresi's conclusion that "defendants' exclusion of worship services is viewpoint neutral," Calabresi Op., supra at **38**, is grounded not upon a comparison of the purposes of the activities allowed and the purpose of Bronx Household's proposed activity, but upon a comparison between the expression already permitted on school premises and "worship." Compare Calabresi Op., supra at **31** (comparing worship services to "Boy Scouts rituals or . . . Elks Club ceremonies" and finding substantial differences) with Good News Club, 533 U.S. at 111 (finding few

religious groups whose presence would convey to the public the message that the government endorses religion (or a particular religion). Cf. Lamb's Chapel, 508 U.S. at 394-395.

differences between Good News Club's proposed activity and Boy Scouts rituals). After he pronounces worship sui generis, Judge Calabresi not surprisingly finds that "worship" is not included within the set of expressive activity hitherto permitted by the Board. This will not do. In order to determine whether an element is within a set, a court should both define the set, see Child Evangelism Fellowship of New Jersey Inc. v. Stafford Township Sch. Dist., 386 F.3d 514, 527 (3d Cir. 2004) (discussing the limited public forum's limits), and analyze the element, to discern whether it has the attributes required for admission to the set, see Goulart v. Meadows, 345 F.3d 239, 252 (4th Cir. 2003) (explaining the importance of identifying "which of . . . various indicia of similarity is the relevant one"). See generally Nix v. Hedden, 149 U.S. 304 (1893) (determining whether tomatoes should be classified as "fruit" or "vegetable" by first defining "fruit" and "vegetable" and then analyzing "tomatoes"). Yet Judge Calabresi defines neither the set -- the "limits" of the limited public forum -- nor the element -- "worship." His comparison is therefore susceptible to reductio ad absurdum, as both the scope of the set and the nature of its prospective member remain substantially unknown.[6]

---

[6] Indeed, Judge Calabresi holds that "worship" is sui generis. But how is it possible to determine whether one activity that is by hypothesis in a class of its own, Webster's Third International Dictionary 2286 (1981) (defining "sui generis"), is within a set comprised of other activities?

(1) Judge Calabresi does not define the limits of the limited public forum.

The first flaw in Judge Calabresi's analysis lies with his delimitation of the limited public forum. He says that we are bound by our decision in Bronx Household of Faith v. Community School District No. 10 (Bronx Household I), 127 F.3d 207, 211-14 (2d Cir. 1997), that the school has created a limited public forum. But the character of a forum is defined by its uses and the uses to which it is put change over time. See Paulsen v. County of Nassau, 925 F.2d 65, 69 (2d Cir. 1991); cf. Grayned v. City of Rockford, 408 U.S. 104, 116 (1972) (stating that "[t]he crucial question is whether the manner of expression [that the petitioner wishes to engage in] is basically incompatible with the normal activity of a particular place at a particular time") (emphasis added). Therefore, while his implicit assumption that the character of the forum has not changed may be correct, he cannot reach this conclusion by simple judicial say-so; such a conclusion must be based on a factual inquiry into the forum's current uses, not those of a decade ago.

Even were I to agree with Judge Calabresi that we should unquestioningly adopt our decade-old legal analysis of the forum, the term "limited public forum" does no judicial work unless we know "the class to which . . . [the] forum is made generally available," Forbes, 523 U.S. at 677. And on this point his

-89-

opinion is silent.[7]

[7] I hold no illusion that defining the limits of a limited public forum is an easy task. For instance, Cornelius instructs that we should consider the government's intent. 473 U.S. at 802; see, e.g., Deeper Life, 852 F.2d at 680; Calash v. City of Bridgeport, 788 F.2d 80, 83 (2d Cir. 1986). But how to distinguish a change of mind -- which the government, like any property owner, is assuredly permitted, see, e.g., Perry, 460 U.S. at 46 -- from viewpoint hostility? Compare Knolls, 771 F.2d at 49-50 ("In the instant case, therefore, whatever previous use has been allowed does not foreclose KAPL from asserting its rights at this time.") (emphasis added) with Robert C. Post, Between Management and Governance: The History and Theory of the Public Forum, 34 UCLA L. Rev. 1713, 1756 ("If the reach of the forum is determined by the intent of the government, and if the exclusion of the plaintiff is the best evidence of that intent, then the plaintiff loses in every case."), and with New York Magazine v. Metro. Transp. Auth., 136 F.3d 123, 129-30 (2d Cir. 1998). On the other hand, if we fix the definition of the forum at the time the government first permits members of the public to use its property for expression, how do we account for the inherently contingent nature of a property's taxonomy? See ISKON, 505 U.S. at 698 (Kennedy, J., concurring) (arguing that if "expressive activity would be appropriate and compatible with [a property], the property is a public forum"); see also Lebron v. Nat'l R.R. Passenger Corp., 69 F.3d 650, 655-56 (2d Cir. 1995); supra (discussing Grayned).

Moreover, courts sometimes make this task even more difficult by covertly collapsing the inquiry into forum definition and forum boundary. See, e.g., Bd. of Educ. of Westside Cmty. Schs. v. Mergens, 496 U.S. 226, 246-50 (1990) (inquiry into whether a secondary school had in fact opened a limited public forum within the meaning of 20 U.S.C. § 4071(a) conducted in tandem with inquiry into whether the secondary school provided "equal access"); Gregoire v. Centennial Sch. Dist., 907 F.2d 1366, 1375-76 (3d Cir. 1990) (considering at the same time whether the school had in fact tightened its control over expressive activity on its premises and whether it was engaging in impermissible viewpoint discrimination).

While I believe that these tensions in First Amendment doctrine are ripe for Supreme Court clarification -- in this respect, at least, I agree with Judge Leval -- Judge Calabresi should not so easily eschew his obligation to define the contours of the limited public forum the Board has allegedly created.

(2) <u>Judge Calabresi does not define worship</u>.

Judge Calabresi's reasoning has a second flaw: It posits that judges can define "worship." He assumes that worship is distinguishable from activities that are plainly within the forum's limits: These include gathering for the purpose of gaining religious instruction, engaging in Bible study, and, if it be the disposition of the participant in such activities, feeling the deity's presence. Indeed, to some men and women of faith, political activism, proselytizing, or even education,[8] amount to worship.[9] How can one quarrel with Justice Souter's classification of Good News Club's after-school Bible study program, permitted by

---

[8] <u>Cf.</u> <u>DeBoer v. Village of Oak Park</u>, 267 F.3d 558, 568 (7th Cir. 2001) ("In adopting the philosophical and theological position that prayer . . . can never be 'civic,' the Village has discriminated . . . ."); <u>Lassonde v. Pleasanton Unified Sch. Dist.</u>, 320 F.3d 979, 984 (9th Cir. 2003) (suggesting that "proselytizing, no less than prayer, is [worship]") (internal quotation marks omitted); <u>Seventh-Day Adventists</u>, 118 Wash. App. at 28-29 ("[T]he Church maintains that worship must be broadly defined to include missionary work, education, charitable giving, communication, publication, and planning and growth activities because these are 'a vital part of the Church's worship program.'").

[9] Moreover, as Judge Bybee explained in his dissent from the Ninth Circuit's denial of rehearing <u>en banc</u> in <u>Faith Center Church Evangelistic Ministries v. Glover</u>, Judge Calabresi may assume a definition of worship that works to "treat[] religious groups differently." 480 F.3d 891, 901 (9th Cir. 2007) (Bybee, J., dissenting from denial of rehearing <u>en banc</u>) (explaining that "[l]iturgically oriented denominations such as Episcopalians and Catholics will [likely] find themselves subject to greater burdens [as] [t]he worship elements of their services are more distinct and easily severable from the non-worship elements").

-91-

the Court, as "worship," 533 U.S. at 138 (Souter, J., dissenting)? Of course, because the concept of worship is so ephemeral and inherently subjective, Judge Calabresi is able to indulge his preference that worship be defined not by what it is, but by what it is not. And what worship is not, in his view (and convenient for his purposes), is anything that the Board has already permitted to occur in the forum. Yet the fact is that none of us, who are judges, are competent to offer a legal definition of religious worship.[10]

Even assuming that judges could define "worship," Judge Calabresi does not explain how he would do so -- perhaps he knows it when he sees it?[11]  Cf. Jacobellis v. Ohio, 378 U.S. 184, 197

---

[10] I do not suggest that "worship" is not possible to define -- just that it is impossible for a court to define.  Were worship truly legally indistinguishable from activities carried on from a 'religious perspective,' laws like the Equal Participation of Faith-Based Organizations, 69 Fed. Register 41,712 (July 9, 2004) (codified at 24 C.F.R. § 5.109) (prohibiting only "inherently religious activities" and defining the term to include worship, religious instruction, or proselytism), might well be unconstitutional.

[11] On this score, I find Judge Calabresi's treatment of Widmar v. Vincent singularly unpersuasive.  Widmar counsels that we should decline to establish a line which, when crossed, transforms the "'singing [of] hymns, reading scripture, and teaching biblical principles,'" . . . [into] unprotected 'worship.'"  See Widmar, 454 U.S. 263, 270 n.5 (1981) (internal citation omitted).  But Judge Calabresi simply dismisses Widmar with the cursory explanation that "Widmar . . . did not conclude that the exclusion of worship constituted viewpoint discrimination." Calabresi Op., supra at **33**.  He ignores the question actually posed, and deemed unanswerable, by the Widmar Court: What is worship?

(1964) (Stewart, J., concurring). Judge Calabresi suggests that one may worship "mammon, sex, or art." Calabresi Op., supra at **34.** Perhaps he means to concede that the term can connote simple reverence for something or someone (like "Tiger Woods" or, in earlier eras, "Frank Sinatra," "Rita Hayworth," or "The Beatles"). See Webster's Third International Dictionary 2637 (1981) (defining worship as "to regard with respect, honor, or devotion"). Or perhaps he means something different; but if so, there is no hint to art history professors everywhere as to how they might turn their classrooms into houses of worship -- surely a useful feat! In short, Judge Calabresi speaks with an obliquity of which any prophet would be proud.

Judge Calabresi's various attempts to avoid defining "worship" are unavailing.[12] First, Judge Calabresi suggests that "Good News Club itself recognized this subject matter, worship, as falling outside the boundary of its viewpoint discrimination jurisprudence." Calabresi Op., supra at **26.** Good News Club did nothing of the sort. The Court simply declined to reach the question presented by this case, which, while not necessary to that case, is to this one, see Good News Club, 533 U.S. at 112 n.4 ("[W]e conclude that the Club's activities do not constitute mere

---

[12] Nor can I agree with Judge Leval that the Board is likely to propound a useful definition of worship at some future date. I see no evidence in the record that the Board is prone to giving fulsome explanations concerning its decisions to grant or deny applications to use school facilities.

religious worship, divorced from any teaching of moral values."), as Judge Calabresi recognizes elsewhere in his opinion, when it suits him, see Calabresi Op., supra at **11** (noting that "the instant appeal's central question" was "unresolved").

Second, Judge Calabresi relies heavily on Pastor Robert Hall's admission that Bronx Household wishes to conduct worship services on school premises. But if we accept plaintiffs' self-description, we should accept their self-definition. And Pastor Hall defines worship as the ascription of "worth to a variety of values and skills," 1st Hall Dep. at 41-42 (discussing 'worshiping' a sunset or work of art); Bronx Household of Faith v. Bd. of Educ. (Bronx Household II), 226 F. Supp. 2d 401, 424 (S.D.N.Y. 2002), not much different in kind from the dictionary definition, supra, "to regard with respect, honor, or devotion." If that is to be the operative definition of "worship," Bronx Household is surely correct that the Board permits other community groups that "ascribe worth to a value or skill" -- i.e.,"worship" -- to use their facilities. Cf. id. ("[T]he Semanonans Stickball players . . . would likely join plaintiffs in worshiping David Wells' pitching prowess.").[13]

---

[13] Judge Calabresi notes that Pastor Hall distinguished worship from Boy Scouts meetings. But he quotes selectively from Pastor Hall's deposition; Pastor Hall also explicitly explains that "[w]e will ascribe worship or praise to David Wells when he almost pitched a second no-hitter. . . . We will praise a sunset. We will also praise a work of art. We will ascribe worth and value to something that we find valuable." 1st Hall Dep. at 41-42. Reading Pastor Hall's deposition

Moreover, and more fundamentally, Judge Calabresi, while he dismisses Bronx Household's as applied challenge to SOP § 5.11, does not reckon with its facial challenge to the rule. Compl. at 6; cf. Faith Ctr. Church Evangelistic Ministries v. Glover, 462 F.3d 1194, 1219 (9th Cir. 2006) (Tallman, J., dissenting) ("Faith Center also brought a facial challenge to the policy."). Bronx Household's facial challenge to SOP § 5.11 implicates the rights of other religious groups, which might not "make [the] nice admission" that they wish to engage in "worship." Id.

Finally, any attempt to define worship places Judge Calabresi upon the horns of a dilemma. Either he clarifies the meaning of "worship," and risks entangling the judiciary in religious controversy in violation of the First Amendment, or he delegates the task of flouting the Establishment Clause to the Board, which will no doubt have to "interpret religious doctrine or defer to the interpretations of religious officials" in order to keep worship, and worship alone, out of its schools. Commack Self-Service Kosher Meats v. Weiss, 294 F.3d 415, 427 (2d Cir. 2002); see also Glover, 462 F.3d at 1220 (Tallman, J., dissenting); cf. Good News Club, 533 U.S. at 127 (Scalia, J., concurring).

**II. The Board's Establishment Clause Defense**

Judge Calabresi does not consider whether the Board can show

"sympathetically," I cannot but conclude that his definition of worship is broader than the (unarticulated) definition upon which Judge Calabresi relies.

-95-

a compelling interest in applying SOP § 5.11 to Bronx Household; because, however, I would find that the Board's exclusion of Bronx Household from the forum is viewpoint-discriminatory, I must address the argument, advanced in the district court, that the Board can justify its position as necessary to avoid an Establishment Clause violation. While avoiding an Establishment Clause violation may as a general matter be a compelling state interest, in this case, the Board's argument is unavailing because Bronx Household's worship at the school does not offend the Establishment Clause.

The endorsement test –- which the Supreme Court now uses to identify Establishment Clause violations –- asks whether "an objective observer, acquainted with the text, legislative history, and implementation of the [challenged law or policy], would perceive it as a state endorsement" of religion. <u>Santa Fe Indep. Sch. Dist. v. Bd.</u>, 530 U.S. 290, 308 (2000). The Board argues –- and Judge Calabresi obliquely suggests –- that permitting Bronx Household the use of school property on Sundays amounts to government endorsement of religion in two ways: (1) It suggests that the state favors religion over non-religion; and (2) Because Bronx Household uses school premises on a more frequent basis than other religious groups, it suggests that the state favors Christianity over Judaism, Islam, or other faiths. Neither argument has merit.

-96-

As we recognized in Deeper Life, "'the semblance of official support is less evident where a school building is used at night . . . by religious organizations, under a program that grants access to all charitable groups.'" 852 F.2d at 681 (citing Brandon v. Bd. of Educ., 635 F.2d 971, 978-79 (2d Cir. 1980)); see also Lamb's Chapel, 508 U.S. at 395 (noting that meetings were not "during school hours . . . [or] sponsored by the school . . . [and are] open to the public, not just church members"). Just so, Bronx Household does not meet during school hours, and its meetings are open to all. See 1st Hall Dep. at 30 ("Our services are always open to the public.").[14] Nor do religious groups dominate the forum. See Bronx Household III, 400 Supp. 2d at 596; cf. Widmar, 454 U.S. at 275. Under these circumstances, there is no likelihood that "an adult who, taking full account of the policy's text, history, and implementation, do[ing] so mindful . . . [of the particular perspective of] impressionable schoolchildren," Skoros, 437 F.3d at 23, would understand Bronx Household's use of school premises to reflect the government's

---

[14] While it is of course true that a Muslim might not be welcome at Bronx Household's worship service, 2d Hall Dep. at 39, it is beyond cavil that the Boy Scouts -- a group the Board readily permits on school property -- also exclude those who refuse to adopt their core beliefs, see Boy Scouts of America v. Dale, 530 U.S. 640 (2000). Thus, I do not see how the Board could deny Bronx Household's putative future application on this ground without also denying applications from, among others, the Boy Scouts. Cf. Leval Op., supra at **71-72.**

preference for religion over non-religion.[15]

I also disagree that the reasonable observer is likely to believe the government favors Christianity over other faiths because, due to the vagaries of the school calendar, the forum is available on Sundays – when Christians worship – and not on Saturdays or Fridays – which are holy to Jews and Muslims. As the Supreme Court explained in Zelman v. Simmons-Harris, 536 U.S. 639 (2002), and Good News Club, an Establishment Clause violation does not result from either private choice or happenstance. Zelman, 536 U.S. at 652; Good News Club 533 U.S. at 119 n.9; see also Harris v. McRae, 448 U.S. 297, 319 (1980) ("[I]t does not follow that a statute violates the Establishment Clause because it happens to coincide or harmonize with the tenets of some or all religions.") (internal quotation marks omitted).

To the extent the Board is troubled by Bronx Household's use of its property, it is free to impose different reasonable time, place or manner restrictions. Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989).

---

[15] Indeed, this case seems the precise opposite of Van Orden v. Perry. In Van Orden, Justice Breyer noted that "the short (and stormy) history of the courthouse Commandments' displays demonstrates the substantially religious objectives of those who mounted them." Van Orden, 125 S.Ct. 2854, 2871 (2005) (Breyer, J., concurring). Here, the decade-long (and equally stormy) history of the Board's dispute with Bronx Household is compelling evidence that the Board lacks a religious objective.

\* \* \* \* \* \*

In the end, this case is one that requires judges to draw lines. Judge Leval has drawn a prudential line in the sand and declines to cross it to decide this case. Judge Calabresi, meanwhile, has drawn a circle around our schools to keep worship (whatever that may be) out. Cf. Mozert v. Hawkins County Bd. of Educ., 827 F.2d 1058, 1073 (Boggs, J., concurring) ("He drew a circle that shut me out -- Heretic, Rebel, a thing to flout. But Love and I had the wit to win / We drew a circle that took him in!"). The approach I follow, while admittedly imperfect in this uncertain legal terrain, at least abjures sleight of hand and ipse dixits. It is also more sensitive to Bronx Household's First Amendment rights. Yet there is no doubt that this particular dispute -- no stranger to the Supreme Court and now focused on worship -- would benefit from a more conclusive resolution by that Court.